THE STATE OF TEXAS ET AL. V. C. W. BRADFORD ET AL.

No. 5765. Decided June 1, 1932.
(50 S. W., 2d Series, 1065.)

518

*Claude Pollard,* former Attorney General, *Robert L. Bob-bitt,* former Attorney General, *C. W. Trueheart* and *W. W. Caves,* former Assistants Attorney General, *James V. Allred,* Attorney General, and *F. O. McKinsey,* Assistant Attorney General, for the State.

*George E. Shelley* and *Fred C. VonRosenberg,* of Austin, and *G. B. Smedley,* of Fort Worth, for plaintiffs in error, Reed and Caswell.

The Court erred in sustaining the general demurrers of the defendants, other than Caswell and Reed, to plaintiff's second amended original petition, and in dismissing the suit; for the reason that it appears from the petition that the North Fork of the Red River in so far as here involved, constituted a statutory navigable stream at the time of the making of the surveys under which said defendants claim, and their surveys were illegal to the extent of their inclusion of the river bed area, being laid across this navigable stream in violation of law, so that neither said defendants nor those under whom they claim acquired any right thereto by the fact of inclusion of this area within their survey lines, but upon the contrary title thereto remained in the State. Article 5302, R. S., 1925; section 42, acts 1837, p. 63; Hartley's Dig., art. 1878; Oldham & White's Dig., art. 1859; article 3911, R. S., 1879; article 4147, R. S., 1895; City of Austin v. Hall, 93 Texas, 591; Motl v. Boyd, 116 Texas, 82, 286 S. W., 458; Landry v. Robison, 110 Texas, 295, 219 S. W., 819; State v. Black Bros., 116 Texas, 615, 297 S. W., 213; Burr's Ferry Ry. Co. v. Allen, 164 S. W., 878; City of Victoria v. Schott, 29 S. W., 681.

We assert that even aside from the general positive statutory prohibition and implied reservation, those things going to make up the contracts of the State with defendants or their predecessors disclose a necessary implication of reservation to the State of the title to the bed of the stream embraced within the survey lines, in spite of the acreage basis of disposition. Rosborough v. Picton, 34 S. W., 791, 43 S. W., 1033; Hynes v. Packard, 92 Texas, 44, 34 S. W., 794, 44 S. W., 548; Roberts v. Terrell, 101 Texas, 577; DeMerit v. Robison, 102 Texas, 358; Landry v. Robison, 110 Texas, 295, 219 S. W., 295; State v. Grubstake Invest. Assn., 117 Texas, 63, 297 S. W., 202; Massachusetts v. New York, 271 U. S., 65.

An examination of the Small Bill discloses that it makes no reference to this suit, which was pending at the time of its enactment, nor to the area involved therein, and that it does not purport to be retrospective. We therefore contend that, even without regard to constitutional objections, this bill can have no application to the subject matter of this suit. Linn v. Scott, 3 Texas, 67; Freeman v. Terrell, 115 Texas, 530, 284 S. W., 946; Sutherland on Statutory Constructions, secs. 367, 388, 642-3.

Upon the theory that the river bed areas comprised in the prior locations had been reserved from donation, such areas, as well as those subsequently surveyed, became equitably a part of the school fund. Constitution, sec. 2, art. VII; R. S., 1925, art. 5416; Act of Feb. 23, 1900, sec. 1; Eyl v. State, 84 S. W., 611; Hogue v. Baker, 92 Texas, 58.

It is submitted that the mere reading of the Conservation Amendment and the Small Bill together makes it appear that the Small Bill was enacted for the benefit of private owners, and in direct disregard of the command in the Constitution that the Legislature should pass laws appropriate to the purposes of the Conservation Amendment, and that the very radical change made by the Small Bill, from the long established policy of the State to hold the river beds in public ownership, to a situation where the land owners are given not only control over the beds of the streams, but absolute ownership of them in fee, necessarily in a practical way will retard the conservation and development of the natural resources of the State and hinder and render impossible the performance of the purposes of the Conservation Amendment. Section 59-a, Article 16, Constitution of Texas; Motl v. Boyd, 116 Texas, 82, 286 S. W., 458; State v. Black Brothers, 116 Texas, 615, 297 S. W., 213, 53

A. L. R., 1181; Imperial Irrigation Co. v. Jayne, 104 Texas, 395, 138 S. W., 575.

The court will take judicial knowledge of the fact that this is a well known stream, an important stream, and that it has a permanent well defined course. See the following authorities on the question of judicial notice: Humphreys-Mexia Co. v. Arseneaux, 116 Texas, 603, 297 S. W., 225; Anderson v. Polk, 117 Texas, 73, 297 S. W., 219; Hoefs v. Short, 114 Texas, 501, 273 S. W., 785, 40 A. L. R., 833; Miller v. T. & N. O. R. R. Company, 83 Texas, 518, 18 S. W., 954; Cator v. Hays, 122 S. W., 953; Hughes v. Adams, 119 S. W., 134.

By filing their applications for oil and gas permits, and by taking the other steps prescribed by the Mineral Act of 1917, the appellants, Reed and Caswell, became purchasers of the oil and gas in and under the areas applied for by them, and became the owners of valid and vested rights, and contract rights in and to said oil and gas and to permits evidencing such rights. Theisen v. Robison, 117 Texas, 489, 8 S. W. (2d) 646; State v. Hatcher, 115 Texas, 336, 281 S. W., 192; Jumbo Cattle Co. v. Bacon and Graves, 79 Texas, 5, 14 S. W., 840; White v. Martin, 66 Texas, 340; Houston Oil Co. v. McGrew, 107 Texas, 220, 176 S. W., 45; Ford v. Brown, 96 Texas, 537; Weber v. Rogan, 94 Texas, 62.

Patents, adverse claims and possession by defendants interposed no obstacle to the fixing of the rights and acquisition of Caswell and Reed. Sherwood v. Fleming, 25 Texas, 408; Gammage v. Powell, 61 Texas, 629; New York and Texas Land Co. v. Thomson, 83 Texas, 169, 17 S. W., 920; Stewart v. Cook, 62 Texas, 522; DeCourt v. Sproul, 66 Texas, 370.

The Small Bill, if construed as affecting the rights of these appellants, is void, because it is a retroactive law, and a law impairing the obligations of contracts in violation of Section 16, Article I, Texas Constitution. Mellinger v. City of Houston, 68 Texas, 37; Wright v. Hawkins, 28 Texas, 452; Sherwood v. Fleming, 25 Texas, 408; Jumbo Cattle Company v. Bacon and Graves, 79 Texas, 5, 14 S. W., 840; Cox. v. H. & T. C. R. R. Company, 68 Texas, 226.

The court erred in sustaining the motions of certain defendants to dismiss the cross actions of these appellants. Texas Channel and Dock Co. v. State, 104 Texas, 169, 135 S. W., 522; Chambers v. Cannon, 62 Texas, 293; Haile v. Johnson, 133 S. W., 1088; Herndon v. Casiano, 7 Texas, 323; Craddock v. Goodwin, 54 Texas, 578; Garcia v. State, 274 S. W., 319.

H. S. Garrett, David Proctor, Lightfoot, Robertson & Scurlock, Phillips, Trammell, Chizum & Price, Burney Braly, Dean & Perkins, F. F. Allen, T. F. Morton, Bryan, Stone, Wade & Angelton, Polk & Sansom, and James & Conner, all of Ft. Worth; Morgan, Morgan & Britain, Bonner, Bonner & Fryer, of Kilgore; Rogers & Thornton, G. R. Pate, Penix & Penix, Geo. L. Kelly, E. C. De Montel, W. H. Sanford, Fitzgerald & Hatchitt, and T. S. Hunter, all of Wichita Falls; Vinson, Elkins, Sweeton & Weems, Lewis Rogers, J. F. Winter, and John C. Townes, all of Houston; R. L. Batts, Cofer & Cofer, Ben H. Powell, White, Wilcox, Taylor & Gardner, and John W. Hornsby, all of Austin; Underwood, Johnson, Dooley & Simpson, Madden, Adkins & Pipkin, Works & Bassett, Birge & Nelson, J. W. Sanders, Shannon, Ochsner & Pheiffer, Carrigan, Britain, Morgan & King, and Don Emery, all of Amarillo; Studer, Stennis & Studer, Cook, Smith & McLynn, and W. Sherman White, all of Pampa; E. G. Senter, Karl F. Griffith, Marshall Newcomb, Roy C. Coffee, John L. Young, W. B. Hamilton, L. B. Woodson, W. H. Francis, A. S. Hardwicke, and Walace Hawkins, all of Dallas; Alvin F. Malony, W. P. Z. German, Horace B. Clay, Y. P. Broome, Davidson & Williams, C. E. Cooper, and A. A. Hatch, all of Tulsa, Okla.; Chas. Hill Johns, of Oklahoma City, Okla.; L. A. Thompson, Jr., of Denver, Colo.; R. H. Hudson, of Bartlesville, Okla.; Lackey & Lackey, of Stinnett; Koerner, Fahey & Young, and Thompson, Mitchell, Thompson & Young, all of St. Louis, Mo.; R. H. Templeton, of Wellington; A. A. Ledbetter, of McLean; Reynolds & Hear, of Shamrock, and Melton & Melton, of Chickasha, Okla., for defendants in error.

The facts alleged are insufficient to show that the part of the river in controversy is a navigable stream under the Texas statute. Sections 21 and 42, Act of December 14, 1837; Halls Mexican Laws, secs. 1406 and 1409; O'Fallon v. Daggett, 4 Mo., 343, 29 Am. Dec., 640; Motl v. Boyd, 116 Texas, 82, 286 S. W., 458; Austin v. Hall, 93 Texas, 591, 57 S. W., 563; Bunnell v. Sugg, 135 S. W., 701; Lumber Co. v. Thompson, 126 S. W., 604.

Inasmuch as the pleadings of all the Appellants show that the State of Texas, by express provisions contained in the surveys and patents involved in this suit, conveyed, by field notes and on an acreage basis, the river-bed area described in this litigation, no reservation by the State of any part of the area contained within said field notes can arise by implication. There can be no implication as against the express terms of

the surveys and patents. Freeport Sulphur Co. v. American Sulphur Royalty Co., 117 Texas, 439, 6 S. W. (2d) 1043; 13 C. J,. p. 558.

An act of the Legislature will not be declared unconstitutional unless it is clearly so, and in case of doubt it will be held valid. Barker v. Torrey, 69 Texas, 12; Judkins v. Land Commissioner, 109 Texas, 6; Koy v. Schneider, 110 Texas, 401; Green v. Robison, 117 Texas, 516, 8 S. W. (2d) 656; Galveston v. Menard, 23 Texas, 349; Anderson v. Polk, 117 Texas, 73 291 S. W., 1112, 297 S. W., 219; Baylor v. Tillebach, 49 S. W., 720; Tabor v. Commissioner, 29 Texas, 508; State v. Black Bros., 116 Texas, 615, 297 S. W., 213.

The opinion of the Legislature of its constitutional powers, as indicated in its passage of a law, is entitled to great weight. Barker v. Torey, 69 Texas, 12; Brown v. City of Galveston, 97 Texas, 1, 75 S. W., 488; Railroad Commission v. H. & T. C. Ry. Co., 90 Texas, 349.

Where the act of some agent of the State, or of some agency which must derive its power to act from the Legislature is void for the reason that, at the time the act was performed, legislative power therefor had not been given, the Legislature may, in the absence of constitutional prohibitions, supply, by a law operating retrospectively, the power originally lacking; so that the act which was originally void is made valid and binding. Morris & Cummings v. State, 62 Texas, 728-39; State v. Powell, 134 S. W., 746, and cases cited (writ of error refused by Supreme Court); Cooley on Constitutional Limitations, 790-1; Nolan County v. State, 83 Texas, 182-200, 17 S. W., 823; Parker v. Harris Co. Drainage District, 148 S. W., 351-361 (writ of error denied by Supreme Court); McMickle v. Hardin, 61 S. W., 322 (writ of error denied); Ball v. Presidio County, 27 S. W., 702-705; Utter v. Franklin, 172 U. S., 417, 43 L. Ed., 498; Calderwood v. Schlitz Brewing Co., 107 Minn., 473, 121 N. W., 221; Anderson v. Santa Anna Township, 116 U. S., 356, 29 L. Ed., 633; Ogburn et al. v. Barstow Drainage District, 230 S. W., 1036.

The so-called Small Land Bill enacted at the Regular Session of the Forty-first Legislature, does not contravene Section 59a of Article 16 of the Texas Constitution, for the reason that said bill expressly reserves to the State and the public generally, and excepts from the operations of the Act, the natural resources located in the river-beds affected, and, by implication, the necessary accompanying rights of ingress and egress to those resources, and all other rights necessary to their proper

use and development. Thompson on Real Property, vol. 4, sec. 3285; Corpus Juris, vol. 18, pp. 294, 295; Greene v. Robison, 109 Texas, 367; Motl v. Boyd, 116 Texas, 82, 286 S. W., 468; Hoefs v. Short, 114 Texas, 501, 273 S. W., 785; The Texas Company v. Burkett, 117 Texas, 16, 296 S. W., 278; Humphreys-Mexia Co. v. Arseneaux, 116 Texas, 603, 297 S. W., 225; Landry v. Robison, 110 Texas, 299; Imperial Irrigation Co. v. Jayne, 104 Texas, 409; St. Anthony Falls Water Power Co. v. City of Minneapolis, 41 Minn., 270, 43 N. W., 56; Elsea v. Adkins, 164 Ind., 580, 74 N. E., 242, 108 Am. St., 320; Fisk v. Brayman, 21 R. I., 195, 42 Atl., 78; Grenada County Supervisors v. Brogden, 112 U. S., 261, 28 L. Ed., 704-7.

The act of the Regular Session of the Legislature of 1929, page 298, known as the Small Bill, expressly purports to be retrospective and to validate the titles to river beds therein described which had theretofore been awarded or patented; and, since said bill did not expressly except from its operation suits pending upon the date of its passage, it had the effect of validating the title to any such river bed, even though a suit was then pending for its recovery. State v. Powell, 63 Texas Civ. App., 405, 134 S. W., 746 (writ of error denied by Supreme Court); Cooley on Constitutional Limitation, 8th Ed., pp. 787-788.

Appellants Reed and Caswell did not, by filing applications for oil and gas permits under the Act of 1917, become purchasers of the oil and gas in the lands in controversy, and did not become the owners of vested property rights or contract rights therein,—because at the time of the filing of their applications all of said lands were included within the boundaries of surveys regularly made for others, which had been approved by the Land Commissioner, and for which lands awards and patents, regular and valid on their faces, had been issued, and were outstanding; and said lands were then occupied and claimed by persons deraigning title through such surveys, awards and patents; and therefore said lands and the oil and gas therein were not, at the time of the filing of said applications, on the market for sale, and were not then being offered for sale by the State. Article 14, Section 2, State Constitution; Act of February 23, 1900; R. S., 1925, Arts. 5416, 5420; Winsor v. O'Connor, 69 Texas, 576; Day Land & Cattle Company v. State, 68 Texas, 549; Juencke v. Terrell, 98 Texas, 237, 82 S. W., 1025; O'Keefe v. Robison, 117 Texas, 142, 299 S. W., 213; Fitzgerald v. Robison, 110 Texas, 468, 220 S. W., 768; Dunn v. Wing, 103 Texas, 393, 128 S. W., 108; Mackey v. Robison, 116

Texas, 373, 291 S. W., 1103; Sawyer v. Robison, 114 Texas, 437; 268 S. W., 151; Guenther v. Robison, 17 S. W. (2d) 765; Tillman v. Erp, 121 S. W., 547, 131 S. W., 1057; Hazelwood v. Rogan, 95 Texas, 295; Southern Pine Lumber Company v. Consolidated Louisiana Lumber Co., 217 Fed., 719; Article 5420 applies to suits for minerals; Yates v. State, 3 S. W. (2d) 115.

MR. JUDGE SHARP of the Commission of Appeals delivered the opinion for the court.

For a partial statement of the nature and result of this case we adopt the statement made by Associate Justice Blair in the opinion rendered by the Court of Civil Appeals, which reads as follows:

"The State of Texas sued appellees in trespass to try title to recover an area of land in Gray and Wheeler counties, constituting the bed of the North Fork of Red River, alleged to have been appropriated to the public school fund, either by section 2 of article 7 of the State Constitution, or by the Act of February 23, 1900 (Acts 26th Leg., 1st Called Sess., c. 11). As ground for recovery the State alleged that said river was a statutory navigable stream, in that it 'retained an average width of more than thirty feet from cut bank to cut bank from its mouth up,' at the time of and continuously since the making of the surveys and awards and the issuing of the patents in controversy; that the lines of these surveys crossed or partly crossed said navigable stream, in violation of article 5302 (Rev. St., 1925), and were therefore illegal to the extent of the inclusion of the river bed area; and that the awards and patents were likewise and to the same extent illegal and void as covering an area or portion of the public domain reserved by public policy and law from locations; and that, although the area in controversy was embraced within the lines and acreage of the surveys, title thereto was by necessary implication reserved to the State, in that the instruments evidencing the sales made no mention of and did not by express language sell or dispose of said area.

"Appellants Caswell and Reed were made party defendants upon the allegation that they were asserting some interest in the land. They filed separate, but identical, answers, except as to the specific land claimed, contending that they had done all acts and things necessary to obtain oil and gas permits in virtue of the Mineral Act of 1917, and by their cross-action sought to have their rights to such permits established in the

event the State recovered the land, as against the State and all appellees.

By amended pleadings the State plead that the Small Bill (Act March 3, 1929, Gen. & Sp. Laws, 41st Leg., c. 138) had no application to the land in controversy, because this suit was pending at the time the act was passed, which made no reference to and did not purport to be retrospective as regards the subject-matter of this suit; and that, if the act should be held to be applicable to the subject-matter of this suit, then it was unconstitutional as being in violation of sections 4 and 5, art. 7, and section 59a of article 16 of the State Constitution. Appellees pleaded the act as perfecting their respective titles to whatever interest in the land in controversy it undertook to confirm, validate, quitclaim, relinquish, or grant.

"Appellees' general demurrers to the State's petition and the cross-actions of Caswell and Reed were sustained and their respective suits dismissed upon their refusal to amend; hence this appeal."

From the judgment of the trial court the State appealed and the Court of Civil Appeals held that the pleadings in the trial court with respect to the navigability of the North Fork of Red River were sufficient and that it was error to sustain general demurrers thereto, and the judgment in this respect was reversed and remanded for a new trial upon that issue. In all other respects the judgment of the trial court was affirmed. 25 S. W. (2d) 706. A writ of error brings the cause here.

Plaintiffs in error contend that the Court of Civil Appeals erred in holding that under the facts set out in the petition of the State, the power of determining the navigability of the North Fork of Red River, as defined by the statute, was not vested in the surveyor who made the surveys and locations, and the Land Commissioner who approved them and made the awards and issued the patents, and that it will not be conclusively presumed, in the absence of fraud or collusion, that these officers, in the exercise of their discretion and honest judgment, found the stream to be non-navigable and made the surveys, locations and awards and issued the patents in question, including therein the river bed area, as a part of the land sold, and that such decision is not binding and conclusive upon plaintiffs in error.

On the contrary, the State contends that the North Fork of the Red River being navigable, under the law of this State, the bed of the river was held in trust by the State for the benefit of the whole people, and was not subjejct to be sold as

was done; that that part of the land embraced within the patents which lies in the river bed was never legally sold or conveyed and that the patents or sales covering that portion of the river bed are void and that the land still belongs to the State.

The State in its pleadings alleged:

"4. That the North Fork of the Red River in the State of Texas and in said counties of Gray and Wheeler, *is a navigable* stream within the purview of the laws of the State of Texas, *in that same retains an average width of thirty feet* from its mouth up, and particularly in so far as it traverses the State of Texas; * * *

"* * *

"7. The foregoing allegation that the North Fork of the Red River in so far as here sought to be recovered, is and was at the times aforesaid a statutory navigable stream, is made separately with respect to said area from the East line of section 123, Block B 2, H. & G. N. Railway Company, Gray County, Texas, to the East line of Section 2 of said block, and as to said upper area is based solely and alone upon the following characteristics of the North Fork of the Red River through and in said area, to-wit:

"(a) The North Fork of the Red River through and in said area retained an average width of thirty feet from its mouth up from cut bank to cut bank at the time of the making of the aforesaid original and corrected surveys, and at the time of the making of the grants, and at the time of the making of the sales of school lands, hereinafter referred to, the distance from cut bank to cut bank through this area ranging from thirty-two and one-half feet to six hundred feet and averaging one hundred and forty-eight feet.

"(b) The sand bed of the stream in this area is devoid of vegetation, except that there are a few large isolated cottonwood trees, about fifteen in number, at irregular intervals, the cut banks through this area being from three to ten feet high, and the higher portions of the river bed frequently have some grasses and small vegetation upon them.

"(c) Through this area in the bed and between the cut banks, as above defined, there is no permanent flowing water on the surface of the sand-bed, there being no springs or source of water other than rain-fall, (except as shown in subdivision '(d)' hereof), such water from rain-fall coming usually from rains in that locality but occasionally when no rain is seen in that locality, and from points above on the North Fork of

the Red River, and the water running only after every sub-
stantial rain from one to ten hours, more usually not over six,
and about four or five times a year running full channel, at
such time the volume of water being about twenty-one hundred
cubic feet per second without overflow, thereafter standing in
two holes from ten to twenty days. This is a semi-arid coun-
try, the rainfall averaging about 19.5 inches per year.

"(d) Besides the water holes following rains as herein-
before referred to, there are two places in this section, one at
the upper end near Section 93 and the other at the lower end
near Section 13, (about 6 miles apart in a straight line and
about 9 miles along the river) where water in sufficient quan-
tity for cattle stands on the surface of the sand bed practically
the year round, and at the upper one of these two watering
places, about one-fourth (¼) acres garden land is irrigated
from two wells on the bank in which the water stands level
with the water on the surface of the river sand bed adjacent."

"(e) The length of this portion of the river herein de-
scribed is about 14 miles as the river runs and about 9 miles
in direct line.

█ The rule is now well settled that courts may take judicial
notice, as a matter of common knowledge, of the natural fea-
tures of the State, including the general location of its moun-
tains and the courses of its rivers and their general history.
Hoefs v. Short, 114 Texas, 501, 273 S. W., 785, 40 A. L. R.,
833; Jones on the Law of Evidence (Edition De Luxe) sec. 127;
Vol. 2 Bouvier's Law Dict., p. 1737.

At the time the principal surveys in question were made,
it is shown that that part of the State was unsettled; that it
was generally considered a dry and semi-arid country with lit-
tle rain-fall and unfit for agricultural purposes; writers have
given graphic descriptions of the country as being barren of
trees and other vegetation; that the water was brackish and
unfit for practical purposes; that it was frequented by Indians,
and hardships and dangers awaited those who ventured that far
from civilization.

In the noted case of the United States v. Texas, 162 U. S.,
1, 16 S. Ct., 725, 40 L. Ed., 867, in which the title of Greer
County was involved, is found an exhaustive opinion setting
out the length and character of the North Fork of the Red
River. The opinion shows that much testimony was introduced
showing that this river was 180 miles long and drained a large
territory. In that case Texas contended that this Fork of Red
River was the true boundary line between Texas and the Indian

Territory. The testimony set out in that opinion shows that the information about the streams and general character of the country was .very meager.

It is further contended that a legal inference of the non-navigability of this river arises from the action of the surveying officers, who, when surveying the lands in that region, ran the survey lines across the river and that in the absence of fraud or collusion, these officers, in the exercise of their discretion and honest judgment, found the stream to be non-navigable and made the surveys, locations and awards and issued the patents in question, including therein the river bed as a part of the land sold.

Also that a like inference can be drawn from the fact that the authors of Article 5302 had in mind the rivers and streams with which they were acquainted, and that on account of the sparsely settled condition of that part of the State and lack of information with respect to the general condition of this stream and the land through which it flows, that the judgment and discretion of the surveying officers in running the survey lines across the North Fork of Red River should be accepted as binding upon the State in the sale of the land underlying the river bed.

In 1837 the Republic of Texas enacted the substance of what is known as Article 5302, R. S., 1925, which reads:

"All lands surveyed for individuals, lying on navigable water courses, shall front one-half of the square on the water course and the line running at right angles with the general course of the stream, if circumstances of the lines previously surveyed under the laws will permit. All streams so far as they retain an average width of thirty feet from the mouth up shall be considered navigable streams within the meaning hereof, and they shall not be crossed by the lines of any survey. All surveys not made upon navigable water courses shall be in a square, so far as lines previously surveyed will permit."

■ The rule long has been established in this State that the State is the owner of the soil underlying the navigable waters, such as navigable streams, as defined by statute, lakes, bays, inlets and other areas within tide water limits within its borders. If that section of the river where these surveys in controversy were made, be navigable, its bed undoubtedly is the property of the State under that rule. In a long line of decisions the courts of this State have consistently held that the public policy and laws of this State prohibit surveys to be made

across navigable streams so as to include the soil under the bed thereof. Anderson v. Polk, 117 Texas, 73, 297 S. W., 222; City of Austin v. Hall, 93 Texas, 591, 57 S. W., 563; N. Y. & Texas Land Co. v. Thomson, 83 Texas, 169, 17 S. W., 920; Swisher v. Crumbles, 18 Texas, 164; Landry v. Robison, 110 Texas, 295, 219 S. W., 819; State v. Grubstake Inv. Assn., 117 Texas, 63, 297 S. W., 202; State v. Black Bros., 116 Texas, 615, 297 S. W., 213; 53 A. L. R., 1181; Petty v. City of San Antonio (Civ. App.), 181 S. W., 224; Bunnell v. Sugg (Civ. App.), 135 S. W., 701; Galveston v. Menard, 23 Texas, 349.

■ However, where the State owns land on both sides of a stream, like the one involved here, where the issue of its navigability is presented, as shown by the pleadings filed by the State, and the surveying officers who made the surveys in the exercise of their discretion and honest judgment ran their survey lines and locations across the stream, as was done here, and the Land Commissioner approved them and made the awards and issued the patents therefor, in the absence of fraud or collusion or abuse of honest judgment on the part of the officers in making said surveys or locations, and in the issuance of the patents or awards, said surveys will not be declared void in toto, but the purchaser or purchasers will take the land embraced within the patents or awards, except that part of the land which underlies the river bed, which will be expressly reserved to the State. City of Austin v. Hall, 93 Texas, 591, 57 S. W., 563; Bunnell v. Sugg (Civ. App.), 135 S. W., 701; Desmuke v. Houston, 31 S. W., 198.

■ Our Supreme Court has had occasion to construe article 5302 and has stated in detail as to the test and meaning of a navigable stream and its bed in this State. Motl v. Boyd, 116 Texas, 82, 286 S. W., 458; Hoefs v. Short, 114 Texas, 501, 273 S. W., 785; 40 A. L. R., 833. In the case of Motl v. Boyd, Chief Justice Cureton, in an exhaustive opinion, reviewed the authorities bearing upon this subject and defined a navigable stream in this State in the following language: "The bed of a stream is that portion of its soil which is alternately covered and left bare as there may be an increase and diminution in the supply of water, and *which is adequate to contain it at its average and mean stage during the entire year, without reference to the extra freshets of the winter or spring or the extreme drouth of the summer or autumn.*" The definition given by Chief Justice Cureton is in complete harmony with the definition of a navigable stream given by the Supreme Court of the United States

in the case of Alabama v. Georgia, 23 Howard, 505, 16 L. Ed., 557.

As already stated, we know from the general history of Texas that at the time these surveys were made, the country was unsettled and that the land was of little value. We also know that at the time the Constitution of 1876 took effect the unappropriated public domain consisted of approximately 75,-000,000 acres of land, stretching hundreds of miles over plains, valleys, rivers and mountains. It is a matter of common knowledge that these surveys were generally located in large blocks; that the railroad companies received the odd numbers of the sections and the school fund the even numbers, and that rarely, if ever, were the lines of each section actually run on the ground—the method usually followed by the surveyor being to run and make a base line for an entire block and on this line block and plat a system of 640-acre surveys. For these reasons, might it not be urged, with some force, that the surveyors were not impressed with the future to which this part of the State might and did attain, and were not as careful in making their surveys, as they might have been, had they known that in due course of time it would support substantial towns, villages, cities and schools? Because of the conditions that existed at the time the surveys were made, should the rights of the whole people of the State in lands under waters and navigable streams be waived or destroyed?

From its earliest history this State has announced its public policy that lands underlying navigable waters are held in trust by the State for the use and benefit of all the people. Rosborough v. Picton, 34 S. W., 791, and cases cited therein: Landry v. Robison, 110 Texas, 295, 219 S. W., 295; Hynes v. Packard, 92 Texas, 44.

■■ The rule is also firmly established that land under navigable waters passes by grant or sale only when so expressly provided for by the sovereign authority, and there is no presumption that there has been any act of the government which could have the effect of passing away its title. No power under the law is given the surveyor or the Land Commissioner to grant soil under navigable waters, and no subsequent recognition or confirmation by the Land Commissioner of a survey made to pass soil under such waters will be presumed. Rosborough v. Picton, 12 Texas Civ. App., 113, 34 S. W., 791; City of Galveston v. Menard, 23 Texas, 349; Galveston Bathing Co. v. Heidenheimer, 63 Texas, 562; Arnold v. Mundy, 6 N. J. Law,

1; Tatum v. Sawyer, 2 Hawks (9 N. C.), 226; Martin v. Waddell, 16 Pet., 369.

■ We find nothing in any of the matters relied upon which would take the question of the navigability or non-navigability of this stream out of the rule stated in Article 5302. This is an important and valuable right. The public policy of this State with respect to navigable streams long has been established and enforced, and it is not a question left to the discretion and judgment of ministerial officers. Under the law, those officers were and are not clothed with the power to settle questions of navigability of streams, but in view of the very nature and importance of the matter, for obvious reasons, it is a question for judicial determination. Oklahoma v. Texas, 258 U. S., 574, 42 Sup. Ct., 406, 66 Law. Ed., 771; Barden v. Northern P. R. Co., 154 U. S., 288, 320, 38 L. Ed., 992, 999; 14 Sup. Ct. Rep., 1030; Gauthier v. Morrison, 232 U. S., 452, 458, 58 Law. Ed., 680, 684, 34 Sup. Ct. Rep., 384; Harrison v. Fite, 78 C. C. A., 447, 148 Fed., 781, 784.

■ The pleadings upon this question filed by the State, as against general demurrers, were sufficient to show that the North Fork of Red River was a statutory navigable stream at the time and continuously since the making of the surveys and awards and the issuing of the patents in controversy. The allegations contained in the petition meet. the requirement announced in the authoritative decisions of this State. The pleadings raise an issue of fact as to whether the North Fork of Red River is navigable or non-navigable. If it is found to be non-navigable, then the sales, patents and awards made were valid and the owners thereof owned the title to the land described therein. If it be determined that the river is navigable, then the title to the land in the river bed belongs to the State, subject to the provisions of the Small Bill hereinafter discussed.

We, therefore, hold that the trial court committed error in sustaining general demurrers to the State's petition upon this question.

Since this case will be reversed, we will consider the other questions presented. The State in its petition alleged that the sections of land whose lines of survey crossed or partly crossed the North Fork of Red River are embraced in H. & G. N. R. R. Co. Blocks 25 and 26, B-2 (Gray County), A 7, 13, 17, 27, A 8, 24 (Wheeler County), Alexander, Crain & Brooks Block No. 1 (Gray County), and I. & G. N. R. C. Co. Block B 3 (Gray County) besides Brooks & Burleson Survey and J. W. Davidson

Survey, Gray County. These H. & G. N. R. R. Co. blocks were made by virtue of the Donation Act of January 30, 1854, the alternate or even numbered sections being thereunder reserved to the State and finally sold by the State to various parties from 1897 to 1900 under Chapter 12 A, Title 87 of the Revised Statutes of 1895, and the Act of May 19, 1897, amendatory thereof. The said I. & G. N. R. R. Co. Block B 3 was made by virtue of Chapter 49, page 69, Special Laws, Second Session Fourteenth Legislature approved March 10, 1875. The said A. C. & B. Block No. 1, and the Brooks and Burleson Survey were granted under Chapter 122 of the Acts of 1874, the even numbered sections in said block being reserved to the school fund and as such sold in the same manner and time as before alleged. The said J. W. Davidson Survey was sold as unsurveyed school land under the Act of February 23, 1900, award being made December 6, 1904.

The original field notes and surveys on all of the sections of land above identified were made in most part in 1873 and 1875, the said Brooks and Burleson Survey being made in 1877, and the said Davidson Survey in 1904. The said original field notes and surveys were in all instances, except as to the Davidson Survey, superseded by corrected field notes, which were duly filed in the General Land Office of the State of Texas and duly approved by the Commissioner of the General Land Office, said corrected field notes and surveys having been made in the case of the H. & G. N. R. R. Co. and I. & G. N. R. R. Co. sections from 1882 to 1888, and in the case of A. C. H. & B. sections and the B. & B. section in 1903 and 1904, patents on a majority of all these sections involved having been heretofore issued, and patents or awards on all the lands involved having been issued, and made more than ten years prior to the filing of this suit, and they are still outstanding and unforfeited, the State in no instance reserving title to the minerals upon sale, and the defendants herein, other than Caswell and Reed are claiming the area thereunder and they or those under whom they claim have been in adverse possession thereof since the dates of the respective grants as aforesaid.

■ The foregoing facts are undisputed. It will be observed that the sales of the lands involved here were made from time to time under the various laws enacted with reference thereto. It will be seen that the youngest title issued by the State was executed December 6, 1904. These owners of the patents and awards held their titles from the State unquestioned until this suit was filed in 1928. Under the various laws the State issued

to the patentees and awardees certain lands for a certain consideration. These patents and awards included certain parts of the bed of the North Fork of Red River, which is now claimed to be navigable. That the patents and awards have been issued for more than ten years and that the land has been occupied longer than that period and that taxes have been paid thereon, is unquestioned. The pleadings do not raise the issue of collusion or conspiracy or the abuse of the honest judgment on the part of the officials in making the surveys and issuing the patents and awards. There is no contention that the surveys contain an excess acreage and that the patentees and awardees are receiving more than their title papers convey. Whatever consideration the State asked for the land under the law has been paid or agreed to be paid by the patentees and awardees. This record shows that the State acted in good faith in issuing these patents and awards and that they were accepted in good faith by the purchasers. Whatever amount of land embraced within the patents and awards lying in the river bed has been paid for or agreed to be paid for by the owners thereof. The State for years has received and held the consideration paid for the land and if it is to be retained by the State the patentees and awardees have paid for or agreed to pay for land they will not receive. The State has a right to exact strict obedience to its laws and Constitution, but it also should be the policy of the State to deal fairly with those who in good faith have accepted its offer to purchase public lands upon terms fixed by the State. That it is the public policy of this State to deal fairly with those who have purchased its public lands and for some reason have not received the correct acreage so purchased and conveyed, the Legislature enacted Article 5411, R. S., 1925, which reads as follows:

"Upon proper proof that money has been in good faith paid into the State Treasury upon lands for taxes, lease and purchase money, for which, on account of conflicts, erroneous surveys, or illegal sales, patents cannot legally issue, or upon lands on which patents have issued and afterwards are legally canceled, the Comptroller may issue his warrant in favor of the proper parties for the amounts so paid. Proof of such payments may be made upon the certificate of the Commissioner thereto when such facts are disclosed by the records of the Land Office. This article shall not apply to surveys, the errors in which may be corrected."

Under the foregoing provision of the statutes the State expresses a willingness to refund to the purchasers a certain sum

in proportion to the number of acres to which no title passed, if the patents and awards include land illegally sold. But an analysis of the State's pleadings shows that a considerable part of this land was patented to certain railroad companies many years ago for the construction of railroads in this State. This land is no longer owned by the railroad companies, but has long ago passed into the hands of others. It is obvious that a fair settlement could not be arrived at by making a refund of the money or consideration paid for that land under the provisions of Article 5411.

To cure, as far as possible, the defect in the claim of the owners whose patents and locations and awards cross navigable streams, the Legislature enacted in 1929, Chapter 138, General and Special Laws, 41st Legislature, known as Article 5414-a, Comp. Texas Statutes Sup., commonly called the "Small Bill." The pertinent parts of Sections 1, 2, etc., of the Act read as follows:

"Section 1. All patents to and awards of lands lying across or partly across water courses or navigable streams and all patents and awards covering or including the beds or abandoned beds of water courses or navigable streams or parts thereof, which patents or awards have been issued and outstanding for a period of ten years from the date thereof and have not been cancelled or forfeited, are hereby confirmed and validated.

"Sec. 2. The State of Texas hereby relinquishes, quitclaims and grants to patentees and awardees and their assignees all of the lands, and minerals therein contained, lying across, or partly across water courses or navigable streams, which lands are included in surveys heretofore made, and to which lands patents or awards have been issued and outstanding for a period of ten years from the date thereof and have not been cancelled or forfeited, and the State of Texas hereby relinquishes, quit-claims and grants to patentees and awardees and their assignees all of the beds, and minerals therein contained, or water courses or navigable streams and also all of the abandoned beds, and minerals therein contained, of water courses or navigable streams, which beds or abandoned beds or parts thereof are included in surveys heretofore made, and to which beds or abandoned beds, or parts thereof, patents or awards have been issued and outstanding for a period of ten years from the date thereof, and have been cancelled or forfeited. * * *"

"Sec. 3. All of the provisions of this Act shall apply equally

to all Spanish and Mexican land grants and titles issued by the Spanish or Mexican Governments prior to the Texas Revolution of 1836, which have subsequently been recognized by the Republic of Texas, or by the State of Texas as valid."

The State, joined by Caswell and Reed, contend that the Small Bill had no application to the land in controversy because: (1) This suit was pending at the time the act was passed which made no reference to and did not purport to be retrospective as regards the subject-matter of the suit. (2) That if the act should be held to be applicable to the subject-matter of this suit, then it was unconstitutional as being violative of Sections 2, 4 and 5 of Article 7, Constitution of Texas. (3) That it violates Section 59a of Article 16, of the Constitution of the State.

With respect to the first mentioned contention it is only necessary to examine the provisions of the Small Bill to find an answer thereto. The caption of the act describes it as "An Act to confirm and validate all patents and awards issued on land lying across, or partly across, water courses or navigable streams of the beds or abandoned beds thereof, or parts thereof, and to relinquish, quit-claim and grant the patentees and awardees and their assigns all of such lands, * * * where such patents or awards have been issued and outstanding for a period of ten years from the date thereof, and have not been canceled or forfeited * * * ; and providing that all of the provisions of this Act shall apply equally to all Spanish and Mexican land grants and titles issued by the Spanish and Mexican governments prior to the Texas Revolution of 1836 which have been subsequently recognized by the Republic of Texas or by the State of Texas as valid."

By the express language and terms used in the act it provides for the validation of the titles mentioned in the caption, the provisions in the body of the act being clearly intended to cure pre-existing defects in the title to river beds, water courses and navigable streams. Section 4 of the act, which is the emergency clause, in our judgment, is conclusive of the question. This section reads as follows: "The fact that surveys and parts of surveys have *heretofore* been made across, partly across water courses in this State, now claimed to be navigable streams, that such surveys, and parts of surveys include the beds and abandoned beds of such water courses, that patents and awards have *issued* for such surveys and parts of surveys, and patentees and awardees and their assignees have held possession of such surveys and parts of surveys, including beds and abandoned beds of such water courses, and *have paid taxes*

*thereon,* that beds of such streams shift and change from time to time and increase and decrease in area, that claims *are now being* made which seriously affect and cloud the titles of patentees and awardees and their assignees thereto, impairing the confidence of the people in grants and titles emanating from the State of Texas and causing great public unrest, creates an emergency, and an imperative public necessity exists, that the constitutional rule requiring bills to be read on three separate days in each House be suspended and that this Act be placed upon its third reading and final passage and take effect from and after its passage, and it is so enacted." (Italics ours).

The Legislature of this State has passed many validating acts. An analysis of the acts passed will disclose that they have been intended to have the effect and have been held to have the effect of operating retrospectively rather than merely as prospectively. For instance, one of the validating acts was passed by the 25th Legislature and is found as Chapter 88, page 113, of the General Laws of 1897. This act was passed for the purpose of quieting the titles to lands located and surveyed by virtue of Confederate Land Certificates where the locations or surveys made under such certificates had not been contiguous or adjacent to each other as had been provided by law and were, therefore, invalid. This act was sustained as being valid. Kurtzman v. Blackwell, 21 Texas Civ. App., 222, 51 S. W., 659 (writ of error refused).

It is, therefore, shown that the Small Bill expressly purports to be retrospective and to validate the titles to lands whose surveys have heretofore been made across streams, now claimed to be navigable, and which had theretofore been awarded or patented. If it appears that the State owned land on both sides of the stream and the surveying officers, in the exercise of their discretion and honest judgment, ran the survey lines across the streams, and the Land Commissioner made the awards and issued the patents therefor, and, in the absence of fraud or collusion or abuse of honest judgment on the part of the State officers, the sale of the lands were made; and if it is shown that the patents and awards have been issued and have been outstanding for a period of ten years from the date thereof and have not been cancelled or forfeited; and if it is shown that the patentees or awardees or their assignees have not received a refund from the State for the acreage lying in the bed of the streams; and the act in all other respects is held valid, as reserving unto the State all rights guaranteed under the Constitution and statutes pertaining to navigable streams; although

the act did not expressly except from its operation suits pending upon the date of its passage, it had the effect of validating the title to any such river bed, even though a suit was then pending for its recovery. State v. Powell, 63 Texas Civ. App., 405, 134 S. W., 746 (writ denied); Cooley on Constitutional Limitations, 8th Ed., pp. 787, 788.

In the case of State v. Powell, supra, it is said:

"Appellee contends that the act in question rendered his location and patent valid ad initio, notwithstanding the intervening judgment in favor of the State. *We think this view correct.* It is true that appellee concedes that the original location and patent were invalid under the rule laid down in Von Rosenberg v. Culler, supra, but it is also conceded by the State that but for the judgment of June 4, 1895, the Act of 1897 would have had the effect of validating defendant's title. The decree setting aside the patent did not render it void. It was already so under the authority last quoted."

Again, in Cooley's Constitutional Limitations, pages 787, 789, it is stated:

"Nor is it important in any of the cases to which we have referred, that the legislative act which cures the irregularity, defect, or want of original authority, was passed after suit brought, in which such irregularity or defect became matter of importance. The bringing of suits vests in a party no right to a particular decision; and his case must be determined on the law as it stands, not when the suit was brought, but when the judgment is rendered."

■ The second contention involves an important question and challenges serious attention. Section 4 of Article 7, Constitution of Texas, provides that lands set apart to the public free school fund shall be sold under certain regulations and that the Comptroller shall invest the proceeds of such sales in the bonds of the United States, State of Texas, or counties in said State, or in such other securities and under such restrictions as may be prescribed by law. Section 5 of Article 7 further provides that the principal of the bonds and other funds and the principal arising from the sale of the lands set apart to the school fund shall be the *permanent school fund* and all the interest derivable therefrom * * * shall be *available school fund* * * * and the available school fund shall be applied annually to the support of the public free schools.

The question presented for our decision: Did the Act of February 23, 1900, chap. XI, S. B. No. 2, Acts of the First

Called Session of the 26th Legislature, adjusting the account between the public school fund and the public domain appropriate river beds to the public free school fund?

Whatever doubt that may have existed against the titles to the upland granted to the patentees and awardees involved here, because the survey lines cross a stream, alleged to be navigable, where patents and awards have been issued and outstanding for a period of ten years from the date thereof, and have not been cancelled or forfeited, and for which no refund by the State has been made for any shortage in the acreage, because illegally sold, as provided for under Article 5411, R. S., 1925, unquestionably the cloud cast against the titles to the upland by reason of the survey lines crossing the stream, has been removed by the passage of the Small Bill. Counsel for the State admit that the Small bill validated or confirmed all the surveys with reference to the upland lying on both banks of the river covered by patents and surveys. Therefore, the precise question before us now for decision concerns only the land lying in the river beds.

In order to ascertain whether or not the Legislature in the enactment of the 1900 Act, intended to grant to the permanent school fund river beds and channels of navigable streams, a brief review of the history of the legislation upon this subject will be helpful.

Prior to the enactment in 1837 of what is now Article 5302, R. S., 1925, the Spanish and Mexican laws with respect to water courses were in effect. Under these laws the waters of all streams, regardless of their width, appear to have been reserved to the government. The reservation of river beds, under the Act of 1837, unquestionably stood until the enactment of the 1900 Act. Did that act pass river beds to the public free school fund? As we have already shown, even prior to the admission of Texas into the Union, it was its policy to reserve unto the government its river beds to be held in trust for all the people. Since Texas became a state, it has rigidly adhered to that policy. Section 1 of the 1900 Act recites that "for the purpose of adjusting and finally settling the controversy between the permanent school fund and the State of Texas, growing out of the division of the public domain, there is hereby set apart and granted to said school fund four million, four hundred and forty-four thousand and one hundred and ninety-five acres or all of the unappropriated public domain remaining in the State of Texas of whatever character, and wheresoever located, including any lands hereafter recovered by the State, except that

included in lakes, bays and islands along the Gulf of Mexico within tide water limits * * *; provided, this Act shall not have the effect to transfer to the school fund any of the lakes, bays and islands on the Gulf of Mexico within tide water limits whether surveyed or unsurveyed."

Section 3 of the act requires the land appropriated to be surveyed and sectionized and classified by the Commissioner.

Section 5 provides that "all tracts or parcels of land, under the provisions of this Act, containing 640 acres or less, and which is now or may hereafter become detached from other public lands may be sold at not less than $1 per acre, cash, without the condition of actual settlement, as now provided by law relating to the sale of other public school lands; * * *"

In the Act of 1905, Article 3980, R. S., 1911, it was provided that "all of the public rivers, * * * together with their beds and bottoms, and all of the products thereof, shall be, continue and remain the property of the State of Texas, except so far as their use shall be permitted by the laws of this State. So far as this use shall relate to the fish and oyster industry, the State Game, Fish and Oyster Commissioner shall have jurisdiction and control thereof according to the authority vested in him by the fish and oyster laws of this state."

In 1913, Chapter 173, S. B. No. 128, the Legislature provided that "all public school, University, Asylum and the other public lands, fresh water lakes, islands, bays, marshes, reefs, and salt water lakes, belonging to the State of Texas, and all lands which may hereafter be so owned and all lands which have been heretofore sold or disposed of by the State of Texas, with a reservation of minerals or mineral rights therein, as well as all lands which may hereafter be sold with reservation of minerals or mineral rights therein, and lands purchased with relinquishment of the minerals therein, shall be included within the provisions of this Act and shall be open to mineral prospecting, mineral development and the lease of mineral rights therein in the manner herein provided."

In 1917, Chapter 83, S. B. 357, the Legislature of Texas amended Chapter 173 of the 1913 Act by adding thereto "river beds and channels" as being open to the prospecting for and the development of minerals.

In 1919, Chapter 74, Senate Bill 114, the Legislature provided that "all the islands * * * lakes, rivers, creeks and bayous within the interior of this State * * * together with all the marl and sand of commercial value, and all the shells, mud-shell or gravel, of whatsoever kind that may be in or upon * * * the

bottom of any rivers, creeks, etc., are hereby placed under the management, control and protection of the Game, Fish and Oyster Commissioner."

The act further provided that the Game, Fish and Oyster Commissioner, by and with the approval of the Governor, may sell the marl, gravel, sand, shells, or mud-shell, included within said act, upon such terms and conditions as he may deem proper, but for not less than four cents per ton, and payment thereof shall be made to the Commissioner. The proceeds arising from such sale shall be transmitted to the State Treasurer *and be credited to the general fund of the State*

In 1921 the Legislature enacted Chapter 55, House Bill No. 476, which provided that "all money now in the State Treasury to the credit of the Game, Fish & Oyster Fund and unexpended, which was received from royalty on oil and gas leases issued upon river beds and channels * * * is hereby transferred to the *available public free school fund* and the State Treasurer shall so credit said sums. All sums of money hereafter received as royalty upon oil and gas from the areas aforesaid and all sums hereafter received as payment upon the acreage of said areas shall likewise be credited to the *available public free school fund."*

In 1925 the 39th Legislature enacted what is now known as Article 4053-d, R. S., and authorized the Game, Fish and Oyster Commissioner, by and with the approval of the Governor, to sell the marl, gravel, sand, shell or mud-shell included within the Act, and further provided that the proceeds arising from such sale shall be transmitted to the State Treasurer and be credited to a *special fund* hereby created to be known the *sand, gravel and shell fund* of the State, and may be expended by the Commissioner in the enforcement of the provisions of the sand, shell and gravel laws and in the establishment and maintenance of fish hatcheries, etc.

In 1931, at the 2nd Called Session of the 42nd Legislature, the Legislature enacted Chapter 40, S. B. No. 25, which recites that "the beds of rivers and channels belonging to the State shall be subject to development by the State and to lease or contract for the recovery of petroleum oil and/or natural gas."

It further provided that all moneys collected under the provisions of this Act by the Board of Mineral Development shall be deposited in the State Treasury *to* the credit of the *mineral development fund;* that all portions of said fund not needed for such purpose shall be from time to time paid into the *general revenue fund,* etc.

Again, in 1925, the 39th Legislature enacted Article 4026, R. S., which provided that "all of the public rivers * * * with their beds and bottoms and all of the products thereof shall continue and remain the property of the State of Texas and the Game, Fish and Oyster Commissioner shall have jurisdiction over and control of in accordance with and by the authority vested in him by the laws of this State."

Other Acts of the Legislature could be cited, but these will suffice for the purposes of this opinion.

In 1917, Section 59a, of Article 16, Constitution of Texas, called the Conservation Amendment, was adopted, which in part reads as follows:

"The conservation and development of all of the natural resources of this State, including the control, storing, preservation and distribution of its storm and flood waters, the waters of its rivers and streams, for irrigation, power and all other useful purposes, the reclamation and irrigation of its arid, semi-arid and other lands needing irrigation, the reclamation and drainage of its over-flowed lands, and other lands needing drainage, the conservation and development of its forests, water and hydro-electric power, the navigation of its inland and coastal waters, and the preservation and conservation of all such natural resources of the State are each and all hereby declared public rights and duties; and the Legislature shall pass all such laws as may be appropriate thereto."

Thus, it will be seen that, since the passage of the 1900 Act, the Legislature has repeatedly passed other legislation with respecet to the beds and channels of navigable streams, which is inconsistent with the contention that it was the intention of the Legislature to set apart and grant unto the permanent school fund beds and channels of navigable streams. If it was the intention of the Legislature to place river beds in the permanent school fund, as contended for here, the provisions of Section 4, Article 7, Constitution, require that all lands set apart to that fund be sold under certain regulations and that the proceeds derived from the sales be invested in certain securities, as provided for by law. Section 5, of Article 7, Constitution, further provides that the principal of the bonds and other funds arising from the sale of lands set apart to the school fund shall constitute the *permanent school fund* and all interest derivable therefrom shall constitute the *available school fund*, which shall be applied annually to the support of the public free schools.

We find that in 1905 the Legislature enacted Article 3980,

R. S., 1911, declaring all public rivers, together with their beds and bottoms and all products thereof to be property of the State of Texas and placing them under the jurisdiction and control of the State Game, Fish and Oyster Commissioner.

Again, in 1919, Chapter 74, S. B. 114, the Legislature provided that all rivers, creeks, etc., together with all marl, shell, gravel, sand, etc., that may be in or upon the bottoms of any rivers, creeks, etc., are placed under the control of the Game, Fish and Oyster Commissioner. The Act further provides that with the approval of the Governor, the marl, shell, sand, gravel, etc., may be sold and the proceeds derived from the sale thereof be credited to the *general fund* of the State.

Furthermore, in 1921, the Legislature enacted Chapter 55, H. B. 476, which provided that all money then in the State Treasury to the credit of the Game, Fish and Oyster Commissioner derived from oil and gas leases issued upon river beds and channels was transferred to the *available public free school fund;* that all sums of money thereafter received as royalty upon oil and gas from the beds and channels of rivers shall be credited to the *available public free school fund.*

In 1931 by the passage of Chapter 40, S. B. No. 25, it declared that the beds of rivers and channels shall be subject to development for oil and gas and the moneys collected therefrom shall be deposited to the credit of the *mineral development fund,* and that all portions not needed for such purpose shall be from time to time paid into the *general revenue fund.*

By referring to the Act of 1900 it is found to contain no specific language setting apart to the school fund river beds and channels of navigable streams. At most the language used is general and because of the general language used in the Act, it is contended that it embraced river beds and channels. Likewise, it will be found that in the Act of 1913 general language was used and it was contended that by reason of the use of such language in that Act, which could be construed to include river beds and channels, that it was the intention to include them in the Act and make them subject to sale or lease for minerals, as provided for in the Act. It will be noticed that the Acts mentioned do not contain specific language that river beds and channels were embraced therein.

Nor can it be successfully contended that Section 2 of Article 7 of the Constitution, independent of the Act of 1900, automatically places one-half of the public domain, including beds and channels of navigable streams, in the permanent school fund. We have carefully considered that section of the Constitution

and find no language contained therein which discloses the intention of the makers of the Constitution to appropriate beds and channels of navigable streams to the school fund. Besides if the Constitution or the statutes place river beds in the Permanent School Fund, Section 4 of Article 7 of the Constitution makes it mandatory that the land be sold.

■ In view of the importance of this matter to the State and the whole people, the courts of this State have consistently held that all grants with respect to lands under navigable waters, such as river beds and channels, are strictly construed against the grantee; that if there is any ambiguity in the Act, it will be construed in favor of the State; and unless the Act contains plain and unmistakable language expressly conveying the land under river beds and channels, it will not be construed to include them. In other words, before a statute will be construed to include land under navigable waters, such as river beds and channels, it will have to be expressed in plain and positive language and not in general language. Landry v. Robison, 110 Texas, 299, 219 S. W., 820; Roberts v. Terrell, 101 Texas, 577; City of Galveston v. Menard, 23 Texas, 349; Rosborough v. Picton, 12 Texas Civ. App., 113, 34 S. W., 791; Hynes v. Packard, 92 Texas, 49, 45 S. W., 562; Dolan v. Walker, ante., p. 361, 49 S. W. (2d) 695; Wiel on Water Rights in the Western States, Section 898.

The case of Landry v. Robison involved the construction of the 1913 Act, which included general language which was contended to include river beds and channels, and Associate Justice Greenwood tersely and accurately states the rule upon this question in the following language:

"Had there been no statutory reservation of the beds or channels of navigable rivers, we do not think that such general language as 'other public lands' could be held to include the soil beneath navigable waters. For our decisions are unanimous in the declaration that by the principles of the civil and common law soil under navigable waters was treated as held by the State or Nation in trust for the whole people. The trust impressed thereon withdraws such soil from the operation of general provisions like those of the Act of April 9, 1913, for the reason that nothing short of express and positive language can suffice to evidence the intention to grant exclusive private privileges or rights in that held for the common use and benefit. City of Galveston v. Menard, 23 Texas, 390; Rosborough v. Picton, 12 Texas Civil App., 116, 34 S. W., 791, 43 S. W., 1033;

Hynes v. Packard, 92 Texas, 49, 45 S. W., 562; Wiel on Water Rights in the Western States, sec. 898."

The case of Dolan v. Walker involved the construction of Chapter 271, Acts of the 42nd Legislature, H. B. No. 358, now Article 5421-c Comp. Texas Statutes Sup., which contains the following general language applied to the public domain as being subject to mineral lease: "All islands * * * and all unsold public free school lands, both surveyed and unsurveyed, shall be subject to lease * * *" and "any person who discovers an unsurveyed area of school land which has not been listed on the records of the Land Office as school land and is not in actual conflict on the ground with land previously sold or appropriated, etc." shall be subject to lease. The rule again was reaffirmed and it was held that the general language used in that Act did not include river beds and channels.

Therefore, a fair and reasonable consideration of the Act of 1900, when construed in the light of the public policy of this State since 1837, with respect to the State holding in trust for all the people lands under navigable waters; also when considered in connection with the adoption of statutory and constitutional provisions with respect to the control and jurisdiction of river beds and channels, as reflected in the various Acts of the Legislature, and Section 59a of Article 16 of the Constitution, above cited; and when construed in connection with the authoritative decisions of this State, which hold that no Act of the Legislature expressed in general language will grant river beds and channels and remove them from the control of the State, leads to the inescapable conclusion that it was not the intention of the Legislature, in the enactment of the 1900 Act, or in the enactment of any other law, to set apart and grant river beds and channels under navigable streams to the public school fund of this State.

■ Nor does the Small Bill violate Section 59-a of Article 16 of the Constitution. We have already set out the material provisions of Section 59-a bearing upon this subject and it specifies certain things as public rights and duties. These rights pertain to the preservation of waters of rivers and streams, for irrigation, riparian and other uses as described therein. It is quite plain that the Legislature in the enactment of the Small Bill did not intend to grant unto the patentees or awardees and their assignees an absolute title to the land described in their patents or awards under navigable waters. The provisions of the Small Bill recognize all those rights to which the beds of statutory navigable streams or water courses had

been theretofore reserved under the public policy and laws of this State. After reciting that the State relinquishes, quit-claims and grants to the patentees and awardees and their assignees all of the lands and minerals therein contained lying across, or partly across, water courses or navigable streams, etc., subject to certain conditions, the Small Bill preserves these rights in the following language:

"* * * provided that nothing in this Act contained shall impair the rights of the general public and the State in the waters of streams or the rights of riparian and appropriation owners in the waters of such streams, and provided further that with respect to lands sold by the State of Texas expressly reserving title to minerals in the State, such reservation shall not be affected by this Act; nor shall relinquish or quit-claim any number of acres of land in excess of the number of acres of land conveyed to said patentees or awardees in the original patents granted by the State, but the patentees or awardees and their assignees shall have the same rights, title and interest in the minerals in the beds or abandoned beds, or parts thereof, of such water courses or navigable streams, that they have in the uplands covered by the same patent or award; provided that this Act shall not in any way affect the State's title, right or interests in and to the sand and gravel, lying within the bed of any navigable stream within this State, as defined by Article 5302, Revised Statutes of 1925."

The Small Bill does not contravene Section 59a, of Article 16, of the Constitution, for the reason that this Act expressly reserves to the State, and the public generally, and excepts from the operation of the Act, the natural resources located in the river beds affected and, by implication, the necessary accompanying rights of ingress and egress to those resources, and all other rights necessary to their proper use and development.

The grant does not impair any mineral rights reserved by the State. No excess acreage shall be recognized under this law. Again the State's title to the sand and gravel in the beds of navigable rivers is in no way impaired. The reservation to the State and the public of the waters of streams would, under well established rules of construction, carry with the reservation all things necessary to the practicable and substantial use of and enjoyment of the things reserved. It carries with it the power to construct dams or other works upon or across the bed of the river in order that the public might enjoy the rights of irrigation or other use of the waters. The decisions of this State hold that grants for public purposes will be liberally con-

strued so as to fully effectuate such purpose. It is equally true that reservations for public purposes in a grant will be liberally construed so as to give full effect to such reservation; and that the reservation of a named right will necessarily carry with it any use of the property granted necessary to effectuate the reserved right. Motl v. Boyd, supra; Imperial Irrigation Co. v. Jayne, 104 Texas, 407; Thompson on Real Property, vol. 4, sec. 3285; Thompson on Real Property, vol. 6, sec. 5136; Corpus Juris, vol. 8, p. 294.

The foregoing contentions are overruled.

 Nor can the Small Bill be declared unconstitutional because it undertakes to confirm and validate titles to land whose survey lines cross the bed of a stream, claimed to be navigable, including land lying in river beds, embraced in the patents and awards issued by the State, and accepted by the purchasers who have paid or agreed to pay the consideration demanded by the State, and which consideration, so paid, is retained by the State, upon the ground that it violates those provisions of the Constitution which provide: (1) That the Legislature shall not have power to grant any relief to purchasers of land belonging to the school fund (Section 4, Article 7, Const.); (2) That the Legislature shall have no power to make any grant of public money to any individual or other person (Section 51, Article 3, Const.). As to the first contention we have shown that Section 4 of Article 7 of the Constitution does not apply to this case, because the lands in river beds have never been appropriated to the school fund. With respect to the second contention, the Small Bill did not undertake to give the patentees and awardees and their assignees anything belonging to the State. The State issued the patents and awards; the State received the purchase price for the lands patented and awarded; the State still retains the consideration paid therefor and, in the exercise of its power, the Legislature decided to retain the consideration received for the land and confirm to the land owners that which they had already bought and paid for or for which the State held their outstanding obligations. In Greene v. Robison, 109 Texas, 367, the Supreme Court held that the Legislature had the right and power to validate titles to lands belonging to the Permanent School Fund and such validation would not violate the provisions of the Constitution. That case is also authority for the rule that a purchaser of school land classified and sold as agricultural land under the Act of April 12, 1883, acquired title in the fee, including the right to

all minerals therein, where such land was not known at the time of sale to contain valuable minerals, though by certain provisions of the Act, the State reserves to itself the minerals on all lands sold under it, and that the State could not grant to another a permit to prospect on it for minerals under the 1913 Act. In that case the Court held:

"Treated as a validating Act, as it should be, the statute granted no relief to purchasers of school lands and was not unconstitutional under Section 4 of Article 7 of the Constitution, as that provision has been uniformly construed. It merely confirmed to them that which they had already bought and paid the State for, or for which it held their obligations undiminished by its operation.

"For the same reason it was not unconstitutional under section 5 of the same article. It was no appropriation of the school fund to foreign purposes. While these lands were by the Constitution dedicated to the school fund, the school fund acquired no title to them as against the State. The State did not thereby become a mere trustee. As the sovereignty, it continued to own the lands just as fully as before their dedication. This has been definitely settled. Judge Stayton settled it in Smisson v. State, 71 Texas, 222, 9 S. W., 112. See, also, Imperial Irrigation Co. v. Jayne, 104 Texas, 395, Ann. Cases, 1914B, 322, 138 S. W., 575. The State, not the school fund, is the source of titles to school lands. And if the Legislature wished to place it beyond doubt that a purchaser of school land had bought and acquired in the purchase of the land all that was in the land, that was, in our opinion, an authority within its lawful powers."

The State having sold and conveyed the lands for a certain consideration, and received and retained the consideration paid therefor, saw fit to retain the money paid or to be paid and validate the titles to the land for which patents and awards have issued. That the State has authority to validate the titles of the land lying in the beds of navigable streams issued in good faith, reserving unto the State for the use of the public all rights reserved by the statutory and constitutional provisions pertaining to navigable streams, rests upon many precedents and sound authorities, involving analogous principles. Acts have been passed validating titles by the King of Spain, by the Government of Mexico and by the State of Texas. Many of the Acts validate grants and sales made before the adoption of the Constitutional Amendment of 1883, and many validate sales of school land made after the adoption of said amendment

and after the Act of 1900, setting apart the remaining domain to the school fund. The validating Acts include grants and sales made to individuals, to cities and towns, to railroads and other corporations, to Confederate Veterans and soldiers. Some of the Acts validate awards and sales of school lands which awards and sales have been held by the courts to be void.

The Act of the 39th Legislature, known as Article 7467a, Vernon's Statutes, "relinquishes, quit-claims and grants unto all incorporated cities and towns that have a population of 40,000 inhabitants * * * all of the beds and channels, and also all of the abandoned beds and channels, of all rivers, streams and other channels that are now or may hereafter be within the present or future corporate limits of such cities or towns in so far as the beds and channels and such abandoned channels of such rivers, streams and other channels may be owned or claimed as the property of the State."

Chapter 186, Acts of 1927, gives to counties, cities and towns, for certain purposes, the rights to take "marl, gravel, sand and mud-shell * * * from any of the waters, rivers or bars * * * without payment therefor."

Chapter 130, Section 4, of the Acts of 1925, Article 5311-b, R. S., validates the title to school lands which have been sold under conditions which rendered the titles void or voidable.

Chapter 167, Acts of 1927, validates, and directs the Land Commissioner to issue patents, covering Porciones 39 and 40, in Zapata County, granted by the King of Spain to Juan Antonio Vidaurri.

Chapter 166, General Laws of 1923, validates all sales of public school land sold to the highest bidder on January 20, 1908, and now situated in Kleberg and other counties.

Chapter 52, Acts of the 38th Legislature, validated the title of M. B. Menard to certain lands in what was Polk county but now San Jacinto county, because of question as to the title as found in the General Land Office.

Senate Bill No. 12, page 68, of the Acts of the 3rd Called Session of the 36th Legislature, validates sales of all public free school lands sold on August 16, 1895, where there has been no proof of occupancy.

Chapter 81, 36th Legislature, validated all sales of public free school lands which were sold on September 25, 1895.

An Act of the 32nd Legislature, 1911, page 206, validates several attempted sales of school land.

Chapter 98, Acts of 1903, validated titles granted to railroad companies and other corporations engaged in works of internal

improvement, where such lands were sold by such companies and corporations after the time provided by law and such grants were therefore deemed subject to forfeiture.

Other Acts could be cited, but to do so would prolong this opinion beyond its proper limit.

The decisions of this State announce the rule that the State can grant soil beneath navigable public waters. Anderson v. Polk, 117 Texas, 73; Baylor v. Tillebach, 49 S. W., 722.

■ The rule is also announced that after the passage of the Act of March 16, 1917, authorizing permits to prospect for oil and gas on public lands in the bed of a navigable stream, a person complying with the provisions of that statute was entitled to the mineral permit applied for thereunder. Landry v. Robison, 110 Texas, 295.

■ The rule is well established where the act of some agent of the State or of some agency which must derive its power to act from the Legislature is void for the reason that at the time the Act was performed legislative power therefor had not been given, the Legislature may, in the absence of constitutional prohibition, supply by law operating retrospectively the power originally lacking so that the Act which was originally void is valid and binding. Morris & Cummings v. State, 62 Texas, 728-39 et seq.; State v. Powell, 63 Texas Civ. App., 405, 134 S. W., 746, and cases cited (writ of error refused by Supreme Court); Cooley on Constitutional Limitations, 790-1; Nolan County v. State, 83 Texas, 182-200, 17 S. W., 823; Parker v. Harris Co. Drainage District, 148 S. W., 351, 361 (writ of error denied by Supreme Court); McMickle v. Hardin, 25 Texas Civ. App., 222, 61 S. W., 322 (writ of error denied); Ball v. Presidio County, 27 S. W., 702-705; Utter v. Franklin, 172 U. S., 417, 43 Law. Ed., 498; Calderwood v. Schlitz Brewing Co., 107 Minn., 473, 121 N. W., 221; Anderson v. Santa Anna Township, 116 U. S., 356, 29 Law. Ed., 633; Ogburn et al. v. Barstow Drainage District, 230 S. W., 1036.

■ The rule is well recognized and is supported by sound principles that what the Legislature could have authorized in the first instance it could ratify, if at the time of ratification it has the official authority to authorize. Anderson County Road District v. Pollard, 116 Texas, 547, 296 S. W., 1062; Tom Green County v. Moody, 116 Texas, 299, 289 S. W., 381.

This Court has recently reiterated the rule that even though an act of an instrumentality or agent of the State was void in

its inception, because of an unwarranted exercise of power or because of an entire absence of power, yet the Legislature may validate such act and make it live. Lyford Ind. School Dist. v. Willamar Ind. School Dist., 34 S. W. (2d) 854; Pyote Ind. School Dist. v. Dyer, 34 S. W. (2d) 578; Young v. Edna Ind. School Dist., 34 S. W. (2d) 857.

Finally, this brings us to a consideration of the claims asserted by Caswell and Reed. In 1927 they filed their application for certain mineral permits on certain lands lying in the bed of the North Fork of Red River and claimed a right under the Mineral Act of 1917, now Articles 5338 to 5352, inclusive, R. S., 1925, which authorized the leasing for mineral purposes of channels and beds of navigable streams. As we have already shown, the State of Texas had issued patents and awards on the land lying in the bed of the North Fork of Red River, upon which Caswell and Reed seek to place their claim thereon, and that the patents and awards had been issued for more than ten years, and it is undisputed that the land had been claimed and occupied by the holders of the patents and awards for more than ten years and that, because the land had already been surveyed, patented and awarded by the Land Commissioner, the application of Caswell and Reed was suspended or rejected. The patents and awards issued by the State covering this land were outstanding and had not been forfeited or cancelled. It is undisputed that the patentees and awardees and their assignees were claiming the title to this land lying in the river bed and were using and occupying it; that at the time Caswell and Reed filed their application for mineral permit this suit by the Attorney General had not been filed to recover this land. Under the well settled rule announced by the Supreme Court in the case of Juencke v. Terrell, 98 Texas, 237, 82 S. W., 1025, the Land Commissioner was clearly within his rights, and it was his duty to reject their claim. By virtue of the holding of the Supreme Court in this case the Land Commissioner was justified in refusing to offer this land for sale or lease for mineral purposes, so long as the titles issued by the State were outstanding. The Supreme Court in that case with respect to Section 2, Article 14, of the Constitution held:

"It is known that at the date of the original Act which appropriated these lands to the school fund, there were many large bodies of land lying in the State held by persons who asserted title thereto, and whose titles had never been adjudicated and were not conceded. It is unreasonable to suppose that the Legislature intended to put such lands upon the market

for sale and thus to turn loose upon the courts a flood of litigation as between the purchasers and the adverse claimants."

Again, in the course of the opinion, after discussing the policy of the State towards offering for sale any public land which "was held, occupied or claimed by any person, association or corporation adversely to the State * * * it would be the duty of the Attorney General to institute suit therefor," etc— the Court further held:

"* * * From this we think it is to be inferred that the policy of the Legislature in reference to lands which were claimed by third parties was first to establish its title before putting them upon the market for sale; and that it was not intended that they should be sold until the controversy between the State and the claimants had been adjudicated."

Again, the Court said:

"The present Constitution contains this provision: * * * 'all genuine land certificates heretofore or hereafter issued shall be located, surveyed or patented only upon vacant and unappropriated public domain, and not upon any land titled or equitably owned under color of title from the sovereignty of the State, evidence of the appropriation of which is on the county records or in the General Land Office; or when the appropriation is evidenced by the occupation of the owner, or of some person holding for him.' Const., art. 14, sec. 2. This provision does not prohibit the Legislature from providing for the sale of such lands; but it very clearly evinces the policy of the State not to encourage litigation by permitting the acquisition from the State of lands which appear upon the official records, or by actual occupancy, to be claimed adversely to it. It should not lightly be assumed that the Legislature intended to depart from that policy.

"Our conclusion is that Section 6 of the Act under construction applied only to such lands as appeared upon the maps and records of the General Land Office not to be claimed by other parties, and to such as had been adjudged to the State, if ever so claimed."

■ So long as the patents and awards issued by the State, through its proper officers, covering the land in bed of the North Fork of Red River remain uncancelled, the Land Commissioner has no authority to annul them. To annul patents and awards is not a ministerial duty and under the law no such duty in this respect rests upon the Land Commissioner. This requires the exercise of judicial authority. Nor has the Land Commission the power to permit others to acquire rights

on the land covered by the patents and awards regularly issued by the proper authorities, representing the State, until the differences, if any, existing between the State and the patentees and awardees and their assignees have been adjusted or adjudicated. The patents and awards issued by the proper officers stand as a barrier to the issuance of the mineral permits sought by Caswell and Reed. Guenther v. Robison, 118 Texas, 485, 17 S. W. (2d) 765; Ray v. Robison, 118 Texas, 331, 15 S. W. (2d) 541; Fitzgerald v. Robison, 110 Texas, 468, 220 S. W., 768; O'Keefe v. Robison, 116 Texas, 398, 292 S. W., 854.

The act of the Land Commissioner in refusing the mineral permits sought by Caswell and Reed under the Act of 1917 was in harmony with the provisions of Section 2, Article XIV, of the Constitution, above cited.

█ It is not the public policy of this State to place public lands upon the market for sale where they have already been sold and are held by patents and awards or other conveyances regularly issued by the officers of this State, and claimed and occupied by those who hold "under color of title from the sovereignty of the State." It is the rule to offer for sale "only vacant and unoccupied public domain." If there is a question about the title to the land, the law requires that the Attorney General bring suit to recover the land or remove the cloud from the title thereof. To offer land for sale about which there is a dispute between the purchasers thereof and the State would create confusion and bring about litigation. Besides, no person would offer a fair consideration for lands already conveyed and the title to which was in doubt. To hold that Caswell and Reed could acquire intervening rights on this land after the officers of the State had regularly issued patents and awards therefor and had received and still retain the consideration paid for the land by the patentees and awardees and their assignees who have held, claimed, occupied, and paid taxes thereon undisturbed for many years, and where the differences, if any, existing between the State and the patentees and awardees and their assignees have never been settled or adjudicated would clearly be repugnant to the public policy of this State in such matters. Cruzan v. Walker, 119 Texas, 189, 26 S. W. (2d) 908; Freels v. Walker, 120 Texas, 291, 26 S. W. (2d) 627; Id., 35 S. W. (2d) 408.

It, therefore, follows that Caswell and Reed can not acquire a vested or intervening right in the river bed of the North Fork of Red River while others hold patents and awards issued by the State thereon. Those who hold the patents and

awards and their assignees have prior rights and until those rights are cancelled or adjusted, under the rule announced by the Supreme Court of this State, others are not permitted to obtain a mineral lease upon this land.

Since this case was disposed of by the trial court sustaining general demurrers to the State's petition, we think it best that the case be reversed generally. It is not known now what issues the pleadings and evidence might raise for determination during another trial and we think it best that the trial court be free to submit or determine all issues properly raised by the pleadings and testimony.

Therefore, that part of the opinion of the Court of Civil Appeals reversing and remanding the cause for another trial will be affirmed, but that part of the opinion which affirmed the judgment of the trial court in all other respects will be reversed, and this cause will be reversed and remanded to the District Court for another trial in accordance with this opinion.

The foregoing opinion is adopted as the opinion of the Supreme Court, and judgment will be entered in accordance therewith.

C. M. CURETON, Chief Justice.