In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-21-00373-CV
_____

ALVIN C. ALLEN JR., Appellant

V.

CROWN PINE TIMBER 1, L.P., Appellee

On Appeal from the 253rd District Court
Liberty County, Texas
Trial Cause No. CV1813827-A

## MEMORANDUM OPINION

In a property dispute over who owns 134 1/7 acres of land in northeastern Liberty County, Crown Pine Timber 1, L.P. (Crown) brought a trespass-to-try-title action against Alvin C. Allen Jr., who pleaded not guilty. Crown traces its purchase of the land at issue to a large tract of timber property that it purchased in 2007, which consists of over 4,600 acres. Crown argues the 134-acres of land at issue belongs

1

to it because it is inside the borders of its tract, which it traced to an 1894 land patent that conveyed thousands of acres of property within the borders of the José Delgado Survey to the heirs of José Delgado. It's undisputed that the José Delgado Patent is based on rights granted to José Delgado in a headright certificate from the state, in which he was granted the right to acquire upon the General Land Office's approval of a survey a league and labor of land.

In the opinion, we will refer to the 134 1/7-acre tract at issue in the dispute as either the 134-acre tract or the Bristley Tract.[1] The parties' dispute over the 134-acre tract hinges on a decision made by the General Land Office (GLO) in 1907 to declare the 134 acres vacant land, which made the land available to the public for sale. The 134-acre tract was declared vacant following a series of requests the GLO received from George R.L. Bristley in the early 1900's claiming that vacant land existed in the general area where the 134-acre tract is located. After receiving these requests, the GLO rejected the requests and advised Bristley that

---

[1]Since the acreage in the tracts referred to in the opinion are approximate, we have rounded the size of the tracts up or down to the nearest whole acre.

his requests conflicted with the José Delgado Survey or other surveys. But in 1907, even though Bristley requested that the GLO recognize a vacancy of more than 134 acres, the GLO reconsidered its position. Relying on a survey that Bristley sent the GLO from a licensed surveyor, the GLO found that a vacancy existed between the José Delgado Survey (approved by the GLO in 1874) and the William Young League Survey (approved by the GLO in 1835). After the GLO declared the 134-acre tract vacant, George Bristley purchased the 134-acre tract as "public land," and the governor conveyed the Bristley Tract to him via a land patent, the Bristley Patent.

In March 2016, Allen bought the Bristley Tract in a tax foreclosure sale after Bristley's successors to the Bristley Tract failed to pay the ad valorem taxes on the tract. In a motion for summary judgment, Crown claimed that the Bristley Tract was not vacant land in 1907 when the Land Commissioner declared it vacant, but that instead it was then and still is part of the much larger tract of timber property that the state conveyed to the heirs of José Delgado via the Delgado Patent in 1874. Both Crown and Allen moved for summary judgment on their claims to the 134-acre tract. In its motion, Crown argued that it has a superior title

to that of Allen in the 134-acre tract through a regular chain of conveyances that it traced from the state to Crown. According to Crown, under the José Delgado Survey and the resulting Delgado Patent, when the GLO declared a vacancy in 1907, no room for a vacancy existed between what Crown contends the evidence conclusively shows in 1894 are the common boundaries of the William Young League and the José Delgado League Surveys, surveys that it argues share a common border, excluding the possibility of the existence of vacancy to create a separate 134-acre tract.

For his part, Allen argued that Crown failed to conclusively prove that no room for a vacancy could have existed within the José Delgado Survey based on the survey that James G. Minter performed in 1874, that is the survey that resulted in the state approving the José Delgado Survey and issuing the Delgado Patent. Allen also argued that because he bought the Bristley Tract at a tax foreclosure sale, because Crown failed to timely challenge his tax deeds, and because Crown failed to comply with other requirements of the Texas Tax Code as a prerequisite

4

to challenging the tax deeds he obtained in the sale, Crown could not challenge the validity of his title in the 134-acre tract.[2]

The trial court granted Crown's motion for summary judgment and denied Allen's. To resolve this appeal we must decide: (1) whether Crown met its summary-judgment burden to establish that the boundaries of the tract conveyed to the heirs of José Delgado (the Delgado Patent) are known with certainty such that a court may determine as a matter of law that no vacancy exists between the William Young League and the José Delgado League Surveys; (2) if the burden of proof shifted to Allen, whether Allen met his summary-judgment burden to show that an issue of material fact exist about whether a vacancy exists where the 134-acre tract is located based on mistakes, conjecture, or supposition by James Minter, the surveyor who performed the José Delgado Survey in 1874;[3]

---

[2]*See* Tex. Tax Code Ann. § 34.08 (placing a deposit requirement on the party challenging a tax deed and creating one and two-year statute of limitations defenses to a person's right to challenge the validity of the title to property purchased in a tax sale); *id.* § 33.54(a) (providing the one-year limitations period created in section 34.08, but the one-year limitations period is subject to an exception when the party challenging the title "was not served citation in the suit to foreclose the tax lien").

[3]*Frost v. Socony Mobil Oil Co.*, 43 S.W.2d 387, 396 (Tex. 1968) (mistake, conjecture); *Turner v. Smith*, 122 Tex. 338, 61 S.W.2d 792, 800 (Tex. 1933) (supposition).

(3) regardless of whether Crown proved legal title and superior title by establishing a regular chain of conveyances from the sovereign to Crown, is the Bristley Patent void; and (4) if the Bristley Patent is void, whether the affirmative defenses Allen raised under the Texas Tax Code defeat Crown's trespass-to-try-title action contesting the validity of Allen's title in the 134-acre tract?

Given the call for adjoinder in the José Delgado Survey that ties the northern border of 134-acre tract to the corner of the William Young League Survey and T & NO Railway Surveys based on Crown's summary-judgment evidence and the call for distance associated with the northern border from that corner, we conclude that Crown met its summary-judgment burden to establish that the José Delgado and William Young League Surveys share a common border. And because that border may be located on the ground with certainty and is shared, no room for a vacancy exists between the borders of the two senior surveys. For that reason, the burden of proof shifted to Allen to present summary-judgment evidence sufficient to raise a genuine issue of material fact to show that, James Minter, the surveyor who performed the 1874 survey, included the call to the corner of the T & NO Railway

6

Survey in his survey that resulted in the José Delgado and the William Young League Surveys sharing a common border by mistake, conjecture, or supposition.

We conclude, however, that the evidence Allen filed in response to Crown's motion fails to raise an issue of material fact to demonstrate that a vacancy exists between those borders when the evidence presented in the summary-judgment motions conclusively establishes that the William Young League and José Delgado Surveys share a common border. As explained in detail below, the unsworn declaration on which Allen relies, even though it is from a licensed surveyor, is unreliable as summary-judgment evidence because for the reasons we explain below "there is simply too great an analytical gap between the data [the expert] relied on and the opinions that [the expert] proffered."[4]

As to Allen's motion for summary judgment and his claims that Crown cannot maintain a trespass-to-try-title action to challenge his tax deeds under the defenses that he raised to its claim under the Tax Code, we hold that the Tax Code provisions on which Allen relies don't prevent

---

[4]*Helena Chem. Co. v. Cox*, 664 S.W.3d 66, 74 (Tex. 2023) (cleaned up).

Crown from challenging Allen's deeds to the 134-acre tract. The tax deeds that Allen acquired, which were signed by Liberty County's Sheriff, conveyed no greater interest in the property than the interest that was held by Allen's predecessors in the Bristley Tract. In the trial court, Allen did not allege or present any summary-judgment evidence to show that any of the prior owners of the Bristley Tract acquired legal or equitable title to the Bristley Tract superior to that of Crown's or to any of Crown's predecessors in title. Thus, since Allen's tax deeds conveyed an interest to him of nothing more than the interest owned by the tract's prior owners, Allen failed to establish that his ownership interest in the 134-acre tract was superior to that of Crown's. And because Crown's ownership interest in the 134-acre tract isn't traced to the "Bristley Survey" and the Bristley Patent, Allen failed to show that his affirmative defenses under the Tax Code are applicable as against Crown and its trespass-to-try-title claim.

Based on the above conclusions which we more fully explain below, we will affirm the trial court's judgment granting Crown's motion and denying Allen's.

## I. Background

This suit involves competing claims to a 134-acre tract of timberland. The tract's location is depicted in the hatched rectangular box, shown below.[5]



---

[5]The diagram shows only a portion of the José Delgado Survey's borders, but the diagram captures the entire area of the land at issue in the dispute. The hatched portion of the diagram is intended to depict the location of the Bristley Survey.

The 134-acre tract is in the northeastern part of Liberty County. Crown claims that the 134-acre tract lies within the northeastern corner of a much larger tract that it now owns. The property that Crown purchased consists of all the acreage in the José Delgado Survey, which consists of over 4,600 acres. Crown bought the tract in 2007 from TIN, Inc. TIN, Inc. was previously known as Temple-Inland Forest Products Corporation.

In the trial court, Crown moved for summary judgment and provided the trial court with evidence tracing its title to the land it bought from TIN to the sovereign through each of TIN's predecessors in title. The summary-judgment evidence shows that the boundaries of Crown's approximately 4,600-acre tract are based on a corrected survey, the José Delgado Survey, approved by the GLO in 1874. The Delgado Survey describes the property the state conveyed in a land patent signed by the governor that same year, the Delgado Patent. The Delgado Patent conveyed the land within the boundaries of the José Delgado Survey to "the Heirs of José Delgado." The Delgado Patent references a headright certificate, which granted José Delgado the right to "[o]ne league and one

labor of land."[6] Before the GLO agreed to approve the survey in 1874, the record shows that its Office required the surveyor who submitted the survey, James G. Minter, to submit corrections to the Land Office. That said, the records of the GLO show that it approved Minter's corrected survey in August 1874.

In September 2019, Crown moved for summary judgment on its trespass-to-try-title claim. In its motion, Crown alleged that its summary-judgment evidence proves that its title in the 134-acre tract is superior to Allen's based on the Delgado Patent, a senior land patent to the Bristley Patent, issued over thirty years later in 1907. According to Crown, when the state patented the 134-acre tract, the 134-acre tract that the state declared vacant did not exist as vacant land. And since the land wasn't vacant but instead was owned by the Delgado heirs, Crown's motion argues, the state did not have the right to declare the land vacant and then sell it since the state did not own the 134-acres that it declared vacant and sold as the 134-acre Bristley Tract.

---

[6]Crown's summary-judgment evidence includes the affidavit of a land surveyor, Nedra Townsend, who states she resurveyed the area in dispute. According to Townsend, a league and labor of land consists of 4,605.54 acres.

11

Under Crown's theory, the calls for adjoinder in the José Delgado Survey clearly define the boundary for the northeastern corner of the large tract conveyed to the Delgado heirs by the state in 1894, the same tract that it purchased in 2007. The calls in that survey identify a point tied to the T & NO Railway Survey #95 and the William Young League Survey as the northeastern corner of the José Delgado Survey in the area at issue in the dispute and call for a line from that point to go for a called distance west along the southern border of the William Young League Survey, resulting in a line that forms the northern border for the José Delgado Survey in the area at issue in the dispute.

Focusing on the calls in the area at issue in the dispute, Crown concludes that based on the calls in the survey the GLO approved that are tied to the 1894 Delgado Patent, no room for a vacancy existed between the William Young League and the José Delgado Surveys' borders for a 134-acre vacant tract. Because Crown established title to the sovereign through a regular chain of conveyances, Crown argued, and established that no room for a vacancy existed in the northeastern corner of its tract, Crown's concludes in its motion that its summary-judgment evidence establishes it has superior title to the 134 acres at issue in the

dispute that lies in the northeastern corner of the tract, the same property Allen claims that he purchased at the tax sale.

Turning to Allen's tax deeds, Crown argued that because the GLO had no authority to declare the tract vacant, the state had no authority to sell land that it did not own, and the Bristley Patent is void. For that reason, Crown argues, Allen's claim is based on deeds purporting to convey ownership interests under a conveyance by the state that is void, meaning an instrument that did not convey legal title in the 134-acre tract to the grantee of that instrument. Crown argues that it would be contrary to the public policy of the state and the Tax Code to prevent it from claiming it holds superior title to the 134 acres at issue when its claim is traced to a valid land patent conveying the property to the Delgado heirs when Allen's claim is traced to a void instrument, which Crown argues did not convey legal title in the 134-acre tract to George R.L. Bristley as the grantee of the Bristley Patent.

Crown's summary-judgment evidence included: (1) deeds and other instruments, which Crown argued establish it has superior title to the tract through a regular chain of conveyances, which it traced to the sovereign; (2) the Bristley Survey and the Bristley Patent; (3) the tax

13

deeds signed by the Liberty County Sheriff to convey the 134-acre tract to Allen; (4) an affidavit from Frank Hyatt, an employee of a consulting company responsible for managing timber properties owned by Crown, including the property in the José Delgado Survey; (5) affidavits with attachments from Anthony Brown, Crown's lead counsel; and (6) an affidavit, survey, and report from Nedra Foster Townsend, a licensed professional and state land surveyor, who resurveyed the José Delgado Survey at Crown's request. In her report, Townsend states that she "was asked to determine the boundaries of the surveys in the vicinity of the José Delgado Survey, Abstract No. 177 in Liberty County, Texas," and that she was asked to "offer opinions based upon [her] fieldwork and expertise regarding the George R.L. Bristley Survey."

Townsend's report and affidavit reflect that in performing the field work for Crown, she resurveyed the boundaries of the Delgado Patent, which were approved by the GLO as corrected by James Minter in 1874. In resurveying the tract, Townsend located the natural and artificial monuments for the lines and corners of the northeastern corner of the José Delgado Survey, and she tied the north-eastern corner at issue in the dispute and boundaries relevant to whether Bristley tract existed to

14

the boundaries of the José Delgado Survey. In her report, Townsend concludes that the 134-acre Bristley Survey, which the state patented in 1907, "is located within the boundaries of the Delgado Patent and does not exist as a separate parcel of property."

Relying in part on Townsend's report and affidavit, Crown argued that "the Bristley Survey is not separate and distinct from the Delgado Survey. There were no 'gaps' because the Delgado Survey adjoins those other earlier surveys." In her affidavit, Townsend swore that she resurveyed the property conveyed to the Delgado heirs via the Delgado Patent "using generally accepted professional surveying techniques."

For his part, Allen has never disputed Crown's claim that the Delgado Patent is the senior patent. Instead, on appeal he argues the trial court erred in granting Crown's motion because: (1) its summary-judgment evidence doesn't "demonstrate an unbroken chain of title from the sovereign;" (2) the summary-judgment evidence demonstrates that a genuine issue of material fact exists about whether "the Delgado Property encompassed the Bristley Property;" and (3) Crown could not challenge the validity of his title under the Tax Code because it waited too long under the Tax Code to do so and failed to deposit the tax debt

15

and other amounts the Tax Code requires as a prerequisite to the filing of its suit into the registry of the court.

Allen also moved for summary judgment on his affirmative defenses to Crown's suit. Allen's motion is based on his theory that Crown's trespass-to-try-title action is barred by the Tax Code, which he claimed applied to Crown's right to challenge whether he obtained valid title to the 134-acre tract through the tax deeds used to convey the property to him.[7] On appeal, Allen argues he is entitled to have the judgment reversed and one rendered in his favor because: (1) the summary-judgment evidence establishes that his title is superior to Crown's even though Crown wasn't a party to the tax foreclosure suits; (2) even if it's true that the boundaries of the Bristley Patent conflict with those of the Delgado Patent, the fact that the boundaries conflict would make the Bristley Patent voidable, not void; (3) Crown's claim is barred on grounds of public policy because public policy disfavors invalidating land titles that have been filed of record for years and relied on by third parties; (4)

---

[7]*See* Tex. Tax Code Ann. §§ 33.54(a), 34.08.

the trial court erred in granting summary judgment without requiring Crown to first deposit the tax debt and other amounts required by the Tax Code into the court's registry as a prerequisite to proceeding with its action; and (5) the one and two-year statutes of limitations provisions in the Tax Code bar Crown's trespass-to-try title action because Crown did not sue it within either the one or two-year periods required by the Tax Code and those limitation periods are intended to protect the rights of purchasers at tax foreclosure sales.

In the trial court, the parties did not dispute that Crown's title is based on the boundaries conveyed to the Delgado heirs in the Delgado Patent. Crown's summary-judgment evidence traces its October 2007 purchase of the tract through various deeds, which show that Crown purchased all the property within the limits or boundaries of the Delgado Survey from TIN, Inc. Frank Hyatt, a land use forester employed by Forest Resource Consultants, Inc. and whose affidavit is included in Crown's summary-judgment evidence reviewed corporate records dating to 1927 from the companies that have owned the property within the José Delgado Survey. Hyatt states in his affidavit that these records show that

"the Delgado Survey has been used exclusively for timber production since 1927."

There is no dispute that in March 2016, Allen bought whatever interest he acquired in the 134-acre tract in a tax foreclosure sale. The record shows that Crown wasn't a party to these two tax foreclosure suits. One of the suits involved two defendants who owned a 75% undivided interest in the 134-acre tract. The other tax suit was against a group of defendants who owned the other 25% undivided interest in the 134-acre tract. On March 1, 2016, Allen bought both the 75% and 25% undivided interests in the 134-acre tract. The Liberty County Sheriff conveyed the tract to Allen in two tax deeds, both of which describe the property as "Tract 1, C.R.L. Bristley Survey, Abstract 907, more fully described in Vol. 1180, Page 206 of the Deed Records of Liberty County, Texas."[8]

The tax deeds both identify the property transferred to the deeds' grantees as the property in the Bristley Survey. In the Bristley Patent, Governor T.M. Campbell also referred to the Bristley Survey as "Sur. No. 52. Geo. R.L. Bristley," which he signed after the GLO determined that

---

[8]The Sheriff signed the deeds on March 21, 2016, and they were recorded in the deed records of Liberty County, Texas on April 29, 2016.

18

the 134-acre tract was vacant land. When Bristley sought to purchase vacant land from the state, he was seeking to purchase land the legislature was authorized to sell as public land appropriated for use by the public schools.[9] The summary-judgment evidence shows that under applications Bristley sent before 1907, that in 1903 and 1904 the GLO had rejected surveys Bristley submitted claiming that a vacancy existed in the areas surrounding the José Delgado Survey, including the general area at issue here. According to the letters from the GLO to Bristley and Liberty County's Surveyor, the GLO rejected Bristley's application

---

[9]*See* Tex. Const. art. VII, § 2 (establishing a perpetual school fund); art. VII, § 5a (establishing a permanent school fund). Currently, the procedures for locating selling and leasing vacant and unsurveyed public-school land are prescribed by the Texas Natural Resources Code, which defines a "vacancy" as "an area of unsurveyed public school that: (A) is not in conflict on the ground with land previously titled awarded or sold; (B) has not been listed on the records of the land office as public school land; and (C) was not, on the application commencement date: (i) subject to an earlier subsisting application; (ii) subject to a vacancy application denied with prejudice; (iii) the subject of pending litigation relating to state ownership or possession of the land; or (iv) subject to a previous vacancy application that has been finally adjudicated by the commission or a court of this state or the United States." Tex. Nat. Res. Code Ann. § 51.172(6).

because the boundaries proposed by Bristley's survey conflicted with the José Delgado Survey.[10]

In January 1907, the GLO changed its position and decided that, subject to a specific surveyor resurveying and correcting his field notes, that office would recognize a vacancy to exist between the José Delgado Survey and the William Young League Survey of around 130 acres. The GLO's January 5, 1907, letter to George Bristley states:

> [T]his department has gone into this matter again, and we find after a more thorough examination that a vacancy can be recognized to the extent of about 130 acres.

[10]Crown's summary-judgment evidence established that the GLO's position about Bristley's application changed over the three-year period in which it considered Bristley's application, his initial survey, and the subsequent corrections to the initial survey that Bristley submitted regarding the vacancy in the area at issue here. In letters dated in the months of May and October 1904, the GLO rejected Bristley's application based on the initial survey that Bristley filed to support a claimed vacancy in the area. In a letter in May 2004, addressed to George Bristley, the GLO advised Bristley that "[i]nasmuch as the José Delgado has open calls for the corresponding lines and corners of the W.W. Young survey and T & NO Ry survey No. 95, no vacancy will be admitted for this, and the same is hereby rejected." In a letter in October 1904 addressed to the County Surveyor, Liberty County, General Land Commissioner John Terrell wrote: "It would appear to me that this is rather an excess than a vacancy and could likely be held under the calls of the Delgado, and that Mr. Bristley, the applicant, when acquainted with the situation, will have no cause for complaint[.]"

The summary-judgment evidence shows the GLO approved the Bristley Survey as if it had received the corrections that it requested from Bristley's surveyor. Even so, according to Nedra Townsend's report, nothing in the GLO's files shows the GLO received the fieldwork from the surveyor that it said it would require before it approved the Bristley Survey.

When Allen responded to Crown's motion, he provided the trial court with the sworn declaration and "Preliminary Report" of a licensed land surveyor, Carr B. Thomson. In Thomson's declaration, Thomson explains that the report he attached to his declaration was preliminary and that he had not "yet reached final conclusions or formed final opinions" because he had only recently been asked by Allen's attorney to reduce his preliminary opinions to writing for the purpose of responding to Crown's motion. Thomson states he was asked to review documents and maps provided to him by Allen and Allen's attorney, and he stated that he had reviewed documents that he found on the GLO's website. In his report, Thomson asks: "Do we honor the course and distance in the original survey or do we honor the calls for adjoinder[]?" Based on the

21

calls for a league and labor of land in Delgado's headright certificate, Thomson notes that Delgado was supposed to receive a tract with "4605.63 acres of land," but that under Norma Townsend's "resurvey of the Delgado[,]" which he had reviewed, "the Delgado contains 5404.64 acres, an excess of 799 acres."[11] That said, except for relying on the calls for adjoinder over the calls for distance, Thomson didn't state he had other reasons to criticize Townsend's resurvey. For example, in his Declaration, Thomson expressed no opinions criticizing Townsend regarding where she located the Pine Island and Willow Marsh Bayous or the artificial objects that she tied to the José Delgado Survey, such as marked trees, monuments, and objects found in several of the survey's corners. Instead, his opinion appears to be that mistakes must have been made by James Minter in 1874 because using the calls for adjoinder in his survey would produce a conveyance with more than the "acreage identified in the certificate," implying that the call to the corner for the T & NO Railway Survey and William Young League must have been a

[11]Thomson provided no explanation to identify how he calculated the total acreage. Townsend's affidavit and report do not include a calculation for a total reported acreage.

22

mistake because the grant contained more than a league and labor of land.

Thomson's reverse logic is clear as his opinion states that the GLO "properly recognized" . . . and "properly patented to G.R.L. Bristley [the 134-acre tract] as a distinct tract of land." He then concluded that Townsend was "mistaken" in relying on the calls for adjoinder in reaching her conclusion that "the Bristley Survey is encompassed by the Delgado Survey's boundaries." Under the circumstances of his preliminary review, Thomson concluded that,

> the calls for adjoinder at issue should yield to [the] calls for course and distance because [in the survey the GLO approved], perhaps among other reasons, the adjoinder calls were very clearly based on much mistake, conjecture and supposition by the manner in which the field notes were written [by the state surveyor who described the tract by using calls for adjoinder without the benefit of resurveying the calls for distance by performing another survey in the field.][12]

---

[12]Crown filed written objections to Thomson's Declaration and report complaining that nothing in Thomson's Declaration or report showed that Thomson had applied the standards applicable to professional surveyors in reaching his opinions or conducted a survey of the property at issue in the suit. Crown also complained that Thomson's Declaration and report represent that his opinions were preliminary, not final. The appellate record, however, does not demonstrate that Crown obtained rulings on its objections.

In September 2019, Allen moved for partial summary judgment on his affirmative defenses. Allen alleged that even if one assumed the Bristley Survey's boundaries were encompassed within the boundaries of the Delgado Survey, Crown's trespass-to-try title claim was barred by public policy and the Tax Code. To support his motion, Allen included: (1) the petitions, judgements, and orders of sale from the two tax foreclosure suits; (2) documents from the GLO's files on the Bristley Survey; (3) an affidavit from Lana McCarty, a registered professional appraiser for the Liberty County Central Appraisal District; (4) an affidavit from Richard L. Brown, the Liberty County Tax Assessor; (5) an affidavit from Rebecca Leopard, an employee for the Liberty County District Clerk's Office; (6) Crown's answer to a request for admission in which Crown admitted it not did pay the tax debts and associated costs for the tax accounts tied to the 134-acre tract; and (7) the citations and returns of citation from the Tax Suit on the case involving the taxpayers who owned the 25% interest in the 134-acre tract. The citation served in the tax case involving the taxpayers who owned the 25% interest in the tract shows that the citation was posted on the courthouse door for "at least 28 days before the return day." The citation commands the

"unknown owner or owners of" land described in the citation as an "undivided 25% interest in the 134.34 acres, more or less, Tract 1, G.R.L. BRISTLEY SURVEY" to appear and defend the suit by April 13th, 2015.[13]

In November 2021, the trial court conducted a hearing on the parties' motions for summary judgment. Following the hearing, the trial court granted Crown's motion and denied Allen's. Because the motions did not address all issues and claims, the trial court also signed an Order Granting Severance, which made the judgment final as to the issues the parties raised in their motions for summary judgment.[14] In its judgment, the trial court declared:

> IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the Patent issued by the State of Texas to

[13]The citations and returns on the first tax case, which involved the defendants that owned the 75% interest in the tract, are not in the appellate record. In his appellate brief, Allen states that "the parties agreed there was no service in the First Tax Case (as to the undivided 75% interest)" on Crown. As to the Second Tax Case, Crown argues the Tax Code provisions do not apply to it because, for among other reasons, it paid its taxes on the property within the boundaries of the Delgado Survey, including the 134-acre tract at issue and because the tax foreclosure suits and resulting tax deeds don't identify the property that was the subject of those suits as property in the José Delgado Survey.

[14]The trial court severed the claims that are relevant to this appeal into Trial Court Cause No. CV1813827-A.

George R.L. Bristley dated July 29, 1907, and filed for record in Volume 23, page 542 in the Deed (Patent) Records of Liberty County Texas, and also identified as Abstract 907, Liberty County Texas, and purportedly consisting of approximately 134 1/7 acres (referred to hereafter in this Judgment as the "Bristley Survey"), is HEREBY DECLARED TO BE LEGALLY INVALID AND VOID.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Bristley Survey is located completely within the property included in Headright Certificate No. 191 issued to José Delgado, which was subsequently conveyed in a Patent issued by the State of Texas to the Heirs of José Delgado dated August 22, 1874 and filed for record under Volume M, Page 15 of the Deed (Patent) Records of Liberty County, Texas, and which is also identified as Abstract 177 in Liberty County, Texas (referred to hereafter in this Judgment as the "Delgado Survey"), and that the Bristley Survey DOES NOT EXIST as a separate parcel of real property.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff Crown Pine Timber 1, L.P. is the sole owner of the Delgado Survey.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the property purportedly conveyed to Defendant Alvin C. Allen, Jr. in the Deed Under Order of Sale in Tax Suits filed for record under Instrument Numbers 2016007191 and 2016007192 in the Official Public Records of Liberty County, Texas DOES NOT LEGALLY EXIST, and therefore said Deeds did not convey any real property to Defendant Alvin C. Allen, Jr.

The judgment also recites: "All relief sought in the Motion and not granted here is denied."[15]

---

[15]*Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 205 (Tex. 2001).

## II. Standard of Review

We review appeals challenging rulings on motions for summary judgment de novo.[16] "To prevail on a traditional motion for summary judgment, the movant must show no material fact issues exist and that it is entitled to judgment as a matter of law."[17] We take as true all evidence favorable to the respondent, and we indulge every reasonable inference and resolve any doubts in favor of the non-movant.[18] If the moving party produces evidence entitling it to a summary judgment, the burden shifts to the nonmovant to present evidence that raises a fact issue.[19]

"When both parties move for summary judgment and the trial court grants one motion and denies the other, . . . we review both sides' summary judgment evidence and render the judgment the trial court should have rendered."[20] We review the summary judgment record in the

---

[16]*Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 218 (Tex. 2022).

[17]*Id.*; Tex. R. Civ. P. 166a(c).

[18]*Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003).

[19]*Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996).

[20]*Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 147-48 (Tex. 2020).

light most favorable to the non-movant, "indulging every reasonable inference and resolving any doubts against the motion."[21]

## III. Analysis

### A. Did Crown Meet its Burden of Proof on its Motion for Summary Judgment?

For convenience, we address Allen's third issue before addressing his first and second issues. In his third issue, Allen argues that Crown's summary-judgment evidence is insufficient to conclusively establish that Crown's title in the 134-acre tract is superior title to his because Crown did not conclusively trace its deed through a regular chain of conveyances to the sovereign and did not conclusively prove that its title was superior to his based on a regular chain of conveyances from a common source. When addressing Allen's first issue, however, we will not include or discuss Allen's arguments that his title to the tract is superior to Crown's based on the strength of his claim to the property under his tax deeds. Our discussion about the arguments that Allen and Crown raise about how the Tax Code applies in this case are addressed in the Court's discussion of Allen's first and second issues.

---

[21]*City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005).

According to Allen, the trial court erred in granting Crown's motion for two reasons. First, there is a gap in its chain of title because one of the deeds that Crown attached to its motion, a deed from Manuela Delgado Guerra and others as grantees conveying the property in the José Delgado Survey (the Delgado Patent) to the Southwestern Development Company, was "unsigned by any of the grantees or their attorney[.]" Second, Allen argues that the unsworn declaration and report of Carr Thomson, the licensed surveyor he attached to his response along with the other summary-judgment evidence attached to his response reveal that there are questions about whether the boundaries established by the calls for adjoinder in James Minter's 1874 survey are calls based on mistake, conjecture, or supposition sufficient to raise material issues of fact as to where the boundaries of the José Delgado Survey are located.

We turn first to Allen's evidentiary complaint about the lack of signatures by grantors and the attorney-in-fact on the Southwestern Development Company deed. The record neither shows that when Allen was in the trial court, that Allen objected to the absence of the signature page from that deed, nor does it show that he obtained a ruling on any

29

objections to the admissibility of the authenticity the Southwestern Development Company deed or any other deeds in Crown's chain of title before the trial court ruled on the competing motions for summary judgment. Consequently, Allen may not now complain about the lack of signatures on a deed that Crown relied on to support its motion for summary judgment when Allen neither filed a timely objection to the admissibility of Crown's summary-judgment evidence complaining in which he complained that the deeds were lacking anyone's signature nor did he provide Crown with an opportunity to correct any defects in its summary-judgment proof before the trial court ruled on Crown's motion.[22] We hold that Allen waived his objection to the absence of some of the grantors' signatures on the Southwestern Development Company deed.

Next, we turn to Allen's argument that the summary-judgment evidence he attached to his response raises a fact issue on the issue of

---

[22]Tex. R. Civ. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal."); *see also Seim v. Allstate Tex. Lloyds,* 551 S.W.3d 161, 164 (Tex. 2018) (holding that the rules of error preservation apply to summary-judgment proceedings).

whether a vacancy existed in 1907 in the northeastern area of the José Delgado Survey when the GLO determined that the 134-acre tract was public land which prior grants had not conveyed.

Allen suggests that whether a vacancy existed must be decided by deciding whether the boundaries of the José Delgado Survey should be measured by the calls for distance or the calls for adjoinder. He relies on the opinion of Carr Thomson to support that conclusion, and Thomson's report is attached to Allen's response. According to Carr Thomson, if the calls for adjoinder control the property conveyed to the Delgado heirs, the borders of the Delgado Survey encompass more than a league and labor of land, a gain of "799 acres to which José Delgado was never entitled under the land certificate" and "under the circumstances presented here." So, since the calls for distance would more closely track the league and labor of land, Thomson asserts (without having performed a survey in the field), and recognizing the calls for adjoinder result in the survey conveying "5,494.65" rather than "the patented acreage" of what José Delgado was entitled to," the "calls for adjoinder at issue should yield to the calls for course and distance" based on Mr. Minter's survey, calls that he "based on much mistake, conjecture, and supposition[.]"

Yet Thomson's conclusions were reached without doing any work in the field. The statements he made in his report and his unsworn declaration also do not expressly state that the opinions he expressed are based on generally accepted surveying principles or techniques. Instead, in his unsworn declaration, he notes that he had a "short amount of time" to prepare it, that his "report is preliminary[,]" that he had not "yet reached final conclusions or formed final opinions about all matters essential to my ultimate conclusions and opinions." The report Thomson provided shows it was prepared just two days before he signed the unsworn declaration. Thomson couched his opinions about what Minter did in 1874 as his "belief." The opinions that Thomson expressed in his report and unsworn declaration are not stated in terms of reasonable probability, and Thomson did not represent that he followed generally accepted surveying principles in reaching what are categorized as the "beliefs" expressed in the declaration and report.

As we see it, the issue in the case is whether Crown met its burden to establish that its title is superior to Allen's in the area at issue, which we have referred to in the opinion as either the Bristley Tract or the 134-acre tract. The 134-acre tract—which is the same property as the Bristley

Tract—is located just south of the William Young League Survey in Liberty County. Even though Thomson's premise appears to be that with respect to Minter's survey mistakes were made and therefore there might be a boundary mistake as to the 134-acre tract, as we see it the issue in the trial court was not whether Minter might have made mistakes somewhere within a 4,600-acre survey performed in 1874 in some of his calls that are not directly relevant to the location of the borders of the small number of acres in the area at issue in the dispute. Rather, the issue was whether a fact issue existed as to whether Minter made a mistake in calling for the border of the José Delgado Survey to adjoin the corner of the William Young League Survey and the T & NO Surveys, as that's the call directly at issue in the dispute, or whether Minter made that call for adjoinder based on conjecture or supposition.

In Texas, "it is firmly established that the rules for the construction of grants, and for ascertaining their boundaries, which have from time to time been announced by the court and have been acted on in establishing their lines, are all designed for the purpose of carrying out the intention

33

of the grantor."[23] Over one-hundred years ago the Beaumont Court of

Appeals explained that, when determining the intention of the grantor,

> natural objects, as called for in the field notes, can be actually found and identified on the ground as showing the footsteps of the surveyor, both course and distance, when inconsistent therewith, must give way and be disregarded. The courts of this state have undertaken to grant the dignity of calls in field notes, and to attach to them different degrees of importance. The first in importance are natural objects, such as streams, hills, mounds, nature of soil, etc. Next in importance are artificial objects, such as stakes, mounds, marked trees, etc., and the least of all, course and distance. This classification and grade of calls, however, is only a rule of evidence. The primary purpose in all cases of the kind is to locate the survey as it was intended to be located on the ground by the original surveyor, and if this can be accomplished with more certainty under the circumstances of the case by the calls for course and distance, they will control. It has been determined, however, that only when the natural or artificial objects called for in the field notes can be found and identified on the ground with reasonable certainty will they control calls for course and distance.[24]

The Texas Supreme Court follows the same rules of priority when

construing deeds. In 1978 that Court explained: "It is an established rule

that the footsteps of the surveyor shall, if possible, be followed, and

---

[23]*John G. & Marie Stella Kenedy Mem'l Found. v. Dewhurst*, 90 S.W.3d 268, 282 (Tex. 2002).

[24]*W.T. Carter & Bro. v. Collins*, 192 S.W. 316, 321 (Tex. Civ. App.— Beaumont 1916, writ ref'd) (internal quotations and citations omitted); *see Stafford v. King,* 30 Tex. 257, 270-76 (1867).

natural or artificial monuments are to be accepted as controlling over calls for course and distance."[25] We recognize, of course, that as the party moving for summary judgment, Crown had the burden to conclusively prove that, in the northeastern corner of its large tract, no vacant land existed when the GLO approved a survey finding a vacancy lying south of the border of the William Young Survey.

The question is Crown's evidence establishes José Delgado Survey call for adjoinder for the Delgado Survey to adjoin the T & NO Railway and William Young League Surveys in the area at issue in the dispute. If it does, that border based on the call for distance from the point, which is not disputed, creates a shared border between the William Young League and the José Delgado Surveys that leaves no room for a vacant strip of land, a strip the GLO recognized (and that Crown challenges as improper) as the Bristley Tract.

The parties take different positions about whether a shared northern border between the William Young League and the José Delgado Surveys may be located with certainty from the calls in Minter's

---

[25]*Howland v. Hough*, 570 S.W.2d 876, 882 (Tex. 1978) (emphasis added).

35

1874 survey. Even though Allen argues that his summary-judgment evidence reveals questions exist about whether the William Young League and José Delgado Surveys share their border in the area at issue, we note that Allen's surveyor, Carr Thomson, didn't conduct a survey in the field when he formed what he characterized as the "beliefs" he expressed in his report and his unsworn declaration. On the other hand, Crown's licensed surveyor, Norma Foster Townsend, performed a field survey before reaching the conclusions that she expressed in her affidavit and report. In her affidavit, Townsend expressly states that she "performed all of these activities [referring to her report] using generally accepted professional surveying techniques."

Besides conducting a field survey of the northeastern corner of the José Delgado Survey to define the border between the William Young Survey and the José Delgado Survey, Townsend also performed field work "to locate natural and artificial monuments in retracing the lines and corners of the area at issue[,]" explaining the work took "several months." In her work, Townsend prepared a plat based on a resurvey that she performed in the field of the José Delgado Survey. The plat that she

prepared lays out the northern, eastern, southern, and western boundaries of the José Delgado Survey.

The tract Allen purchased in the tax foreclosure sale is described in the tax deeds as "134.00 Acres, more or less, Tract 1, C.R.L. Bristley Survey, Abstract 907." Townsend's plat of the Delgado Survey shows that the northern border of 134-acre tract that Allen claims he owns shares a border with the William Young League Survey, which is to its north. Townsend's border for the 134-acre tract is shown as a common border between the William Young League and José Delgado Surveys, and Townsend's opinion aligns with the call for adjoinder in James Minter's 1874 survey.

What's more, Townsend's report explains that the William Young League Survey replaced an earlier land grant, the Lucinda Dyches Grant, which Townsend said is considered void "because of the disturbance in land titles cause by the [Texas] Revolution." According to Townsend, the revolution caused authorities to stop issuing land grants between November 1835 through January 1838, and for that reason Townsend stated that, in her opinion, "it is correct [for Minter in his survey notes] to allow [the T & NO Railway] Survey [#]95 to join the [William] Young

37

[League A-60 Survey]" since the William Young League A-60 Survey replaced the Lucinda Dyches Grant.[26] Thomson fails to discuss or account for these statements in his unsworn declaration or his preliminary report.

The conclusions Townsend expressed in her affidavit are based on the survey she conducted in the field, her review of the information from the GLO, which she tied to that GLO's approval of Minter's corrected survey, information from the GLO relating to its approval of the Bristley Survey in 1907, and the surveys surrounding the José Delgado Survey. Townsend stated that, based on her review and field work:

> [I]t is my opinion that the Bristley Survey was located and patented in 1907 on property already included in the Delgado Survey in its 1874 patent. As a result, the Bristley Survey is located within the boundaries of the Delgado Survey, and does not exist as a separate parcel of property.

For his part, when Allen was in the trial court, he did not contend that in 1874, the Delgado Survey the GLO approved did not include open calls to the corners to the William Young League and T & NO Railway Surveys. Instead, Allen argued that by following the calls for distance

---

[26]Townsend noted that in Minter's correction of the Delgado Survey, "he called to adjoin these T&NO Survey's."

rather than the calls to the corners in the 1874 José Delgado Survey from a fixed marker that Townsend located in the Alpheus Rice Survey, a marker around two and one-half miles to the southwest of the Bristley tract, the steps that Townsend followed would fall short of the northeastern corner of the northern corner where the William Young League and T & NO Railway Survey #95 Survey intersect by "approximately 200 varas[,]" the equivalent of about 556 feet.[27] Allen also argued that if one were to give priority to the calls for adjoinder over the calls for distance, Thomson's report states that if Townsend's boundaries of the Delgado Survey are followed, it shows the state conveyed a tract to the Delgado heirs that included around 900 acres more than the state intended when it granted José Delgado a headright certificate and granted him one league and labor of land (4,605.5 acres).

---

[27]Even if one were to assume that the calls for distance that Thomson "believed" Minter intended should control, the resulting strip of vacant land created by recognizing a vacancy would be less than half the 134-acre tract that the GLO recognized when, in its 1907 about face, the GLO failed to honor the open calls for adjoinder to the William Young League and T & NO Railway Surveys, calls it had previously recognized in rejecting Bristley's prior surveys requesting the GLO recognize a vacancy existed in same area at issue here.

In our view, the issue is not what acreage is in the whole tract but rather whether Crown carried its burden to establish that the calls in the survey for the Delgado Patent left no room for vacancy in the area that is at issue in this dispute. If the call to adjoinder for the T & NO Railway Survey, the William Young League Survey (f/k/a Lucinda Dyches Grant), and Jose Delgado Survey are followed, the border between the William Young League Survey and the José Delgado Survey is clearly defined given the call for distance that goes west from the northwestern corner of the T& NO Railway Survey #95 where those three surveys join. Minter's call for those surveys to adjoin is based on a headright survey performed in 1860 by a surveyor named T.C. Turner, whose survey Thomson wholly fails to address. Turner's survey calls for the Delgado Survey to adjoin surveys that existed in the area. The T & NO Railway Survey #95 was laid out in 1870, and it was corrected by a surveyor named James F. Weed in 1890. As to the corner at issue, the Delgado Patent recites that the line is "in the line of the William Young League" and to "stake at corner with the Northwest corner of the swamp N.O. RR Survey No. 9's." In her report, Townsend explains how Turner's survey and subsequent survey by another licensed surveyor, James F. Weed in

40

1890 are relevant to the numbering of the tracts carved from the T & NO Railway Surveys, which were granted to the T & NO Railway and identified as T & NO Railway Surveys in Turner's 1860 survey. In his unsworn declaration and report, Thomson did not address Turner's survey, Weed's survey, or the statements that Townsend made about them in her report.

The call for adjoinder in the Delgado Patent conveying the property to the heirs of José Delgado is defined in the surveys. It defines a point from which based on a call for distance a line may be drawn to create a clearly defined border, a border shared by the William Young League and the Delgado Surveys in 1894. In *Booker v. Hart*, 77 Tex. 146, 12 S.W. 16, 19 (1889), when addressing a vacancy case, the Texas Supreme Court explained that when the evidence indisputably fixes one corner of a survey as a shared border of a tract, the corner "gives us the disputed line, a common boundary of [the tracts involved], dispelling the idea of any vacancy between them." We apply that principle here. If the open calls for adjoinder tie the José Delgado and William Young League Survey's together such that they have a common border, a reasonable jury could reach just one conclusion—no vacant land existed when the

41

GLO found a 134-acre vacancy existed between the borders of the William Young League and José Delgado Surveys.[28]

Ultimately, the question about whether Allen's evidence raises an issue of material fact boils down to whether Thomson's report and unsworn declaration is reliable as summary-judgment proof. At the summary-judgment stage, the unreliable opinion of an expert is not competent evidence, and since it is not competent evidence it will not create a fact issue that precludes a court from granting a motion for summary judgment.[29] That's because unreliable testimony "is no more than subjective belief or unsupported speculation."[30] In the case of an expert, when "the expert brings only his credentials and a subjective opinion, his testimony is fundamentally unsupported and therefore is of

---

[28]The length of the border in the northeastern section of the Delgado Survey wasn't in dispute. The dispute was whether as it relates to the 134-acre tract the Delgado Survey and the William Young League Survey share a border or whether a vacancy existed in 1907 between the William League and José Delgado Survey's borders of about 134 acres.

[29]*Seger v. Yorkshire Ins. Co.*, 503 S.W.3d 388, 410 n.23 (Tex. 2016) ("Unreliable expert testimony is legally no evidence."); *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 713 (Tex. 1997) ("If the expert's scientific testimony is not reliable, it is not evidence.").

[30]*E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995) (cleaned up).

no assistance to the jury."[31] The Texas Supreme Court has explained why incompetent expert testimony amounts to no evidence this way:

> The mere *ipse dixit* of the expert—that is, asking the jury to take the expert's word for it because he is an expert—will not suffice. Instead, an expert's conclusions must have a reliable basis other than the expert's say-so. And if no basis for the expert opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence.[32]

When assessing an expert's reliability, "courts must consider not just whether the expert's methods are grounded in science, but also whether the data to which the expert applies his methods are reliable."[33] Experts may not base opinions on data drawn from data that is unreliable.[34] "[A]n expert's testimony is unreliable even when the underlying data are sound if the expert draws conclusions from that data based on flawed methodology. A flaw in the expert's reasoning from the data may render reliance on a study unreasonable and render the

---

[31]*Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 801 (Tex. 2006).

[32]*Helena Chem. Co. v. Cox*, 664 S.W.3d at 73 (internal quotations and citations omitted).

[33]*Id.* at 73-74.

[34]*Merrell Dow Pharms., Inc.*, 953 S.W.2d at 714.

inferences drawn therefrom dubious."[35] Likewise, "if an expert's opinion is based on certain assumptions about the facts, we cannot disregard evidence showing those assumptions were unfounded."[36]

Expert testimony may also become too unreliable to serve as evidence when there is too "great an analytical gap between the data and the opinion proffered."[37] When courts are asked to examine the testimony of an expert, they do not "ignore fatal gaps in an expert's analysis or assertions that are simply incorrect."[38] "Analytical gaps may include circumstances in which the expert unreasonably applies otherwise sound principles and methodologies, the expert's opinion is based on assumed facts that vary materially from the facts in the record, or the expert's opinion is based on tests or data that do not support the conclusions reached."[39]

---

[35]*Id.*

[36]*City of Keller*, 168 S.W.3d at 813.

[37]*Elizondo v. Krist,* 415 S.W.3d 259, 264 (Tex. 2013).

[38]*Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 912 (Tex. 2004).

[39]*Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 349 (Tex. 2015) (citations omitted).

We conclude that Thomson's analysis about whether a vacancy existed prior to 1907 between the borders of the William Young League and José Delgado Surveys in the area at issue is analytically flawed for these three reasons. First, at the outset of his report Thomson expressly recognized that his opinions were based on data that wasn't complete: "The report is preliminary in that I haven't reached final conclusions or formed final opinions about all matters essential to my ultimate conclusions and opinions." He signed the unsworn declaration just two days later, and nothing in his unsworn declaration shows that he had reviewed any additional material or that the data he reviewed was complete. We recognize that Thomson states that he has "seen enough" to form an opinion that the GLO "properly recognized" the Bristley Survey as a vacancy. But his statement that another office found a vacancy proper is no more than ipse dixit, as the explanation doesn't explain why if there were mistakes as he claimed why the vacancy that he claims occurred would have occurred in the location at issue within a 4,600-acre tract as opposed to somewhere else. And importantly, Thomson's unsworn declaration and report fail to explain why room for a vacancy could exist when the calls for adjoinder in Minter's 1874 survey

and Turner's 1860 survey include open calls for adjoinder to the T & NO Railway Surveys, calls that created a common border in the area at issue in this dispute, and calls that leave no room for a vacancy between the common border shared by the William Young League Survey and the José Delgado Survey, tying the borders of those two surveys to the T & NO Railway Survey.

Second, unlike Thomson, Townsend performed work in the field and prepared a plat to support her opinion that the Bristley Survey is located within the boundaries of the José Delgado Survey. Because the 134-acre tract lies within the José Delgado Survey's borders, the Bristley Survey never existed as a "separate parcel of property" when the GLO declared it vacant. Thomson also failed to address all the natural and artificial monuments that Townsend found when performing her work in the field to support the opinion she expressed in her report, and he didn't explain why those calls don't offer further support for Townsend's opinion that the call for adjoinder at issue to the T & NO Railway Surveys have priority over the calls for course and distance in Minter's 1874 survey as they relate to the boundary at issue.

46

Third, Thomson failed to explain why, even if Minter's survey conveys more than one league and labor of land, that the excess land conveyed to the Delgado heirs would result in a 134-acre vacancy in the area at issue in the dispute. Stated another way, Thomson doesn't explain why T.C. Turner, who surveyed the property in 1860 for the headright certificate, or James Minter, who surveyed the property in 1874 to update surveys performed after 1860, would have intended to create a strip of vacant land between two existing senior surveys when they described the borders of the José Delgado Survey, or why Minter would not have known where the boundaries were of the senior surveys to the José Delgado Survey when including the calls for adjoinder to the corners of existing senior surveys.

We hold that Allen' response to Crown's motion fails to present sufficient evidence to raise an issue of material fact to meet his burden of proof to overcome Crown's evidence that Crown has superior title to the 134-acre tract at issue in the parties' dispute. Allen's third issue is overruled.

47

B. Do Allen's tax deeds give him superior title in the 134-acre tract to that of Crown?

Next, we must decide whether the tax deeds conveying the tract to Allen is void as against Crown's claim that it has superior title to the tract. To decide that question, we must determine whether the Commissioner of the GLO had the authority to authorize the sale of property that, in 1907, the state did not own.

In 1907, the year the Land Commissioner recognized the vacancy at issue, the Commissioner of the GLO had the authority to declare a vacancy between "older surveys" under the two conditions: (1) if the 134 acres at issue was "unappropriated public domain remaining in the State of Texas" as of February 23, 1900 under the Public Domain—School Lands Act;[40] and (2) if the land was, on or after April 15, 1905, either still unsurveyed or vacant under the Lands, School and Asylum Act.[41] As we

---

[40]Act of February 23, 1900, 26th Leg., 1st C.S., ch. IX, § 1, 1900 Tex. Gen. Laws, 29, 31, *repealed by* Act of June 21, 1969, 61st Leg., R.S., Ch. 889, section 15.01(a), 1969 Tex. Gen. Laws 2735, 2798-99 (current version at Tex. Educ. Code Ann. § 43.001(a), which with exceptions not relevant here provides that the permanent school fund consists of "all of the unappropriated public domain remaining in this state").

[41]Act of April 15, 1905, 29th Leg., R.S., ch. 103, § 8, 1905 Tex. Gen. Laws 159 (repealed 1969). Currently, the School Land Board is the body

48

have already concluded that when the GLO declared the vacancy in 1907 that the 134 acres involved had already been conveyed to the Delgado heirs, we conclude the Commissioner of the GLO was not authorized to declare the 134 acres vacant. In 1907, the 134 acres—put simply—was not "unappropriated public domain."[42]

Our holding follows the Texas Supreme Court's holding in *State v. Bradford*, 121 Tex. 515, 552, 50 S.W.2d 1065, 1080 (1932). There, the *Bradford* Court explained that a fact issue existed about whether land, where a stream was located, was navigable because if it wasn't, the Commissioner of the Land Office was not authorized to declare it vacant, explaining:

So long as the patents and awards issued by the State, through its proper officers . . . remain uncancelled, the Land Commissioner has no authority to annul them. To annul patents and awards is not a

---

having the authority to approve tracts of public land owned by the state for sale (except for the state's mineral interest in the tract) under the provisions that are in sections 11.084 and 51.011 of the Texas Natural Resources Code. Tex. Nat. Res. Code Ann. §§ 11.084, 51.011 (Supp). Allen did not argue in the trial court, and he does not argue in the appeal that these provisions applied to Crown.

[42]*Id*.

ministerial duty and under the law no such duty in this respect rests upon the land Commissioner. This requires the exercise of judicial authority. . . The patents and awards issued by the proper officers stand as a barrier to [selling the rights issued under those patents or awards to others].[43]

When something is void, it is "[o]f no legal effect, null."[44] In Texas, it has long been settled that,

> a patent which has been issued contrary to law is void. It is too firmly settled by the whole current of judicial decisions on the point to be now questioned, that the issuance of a patent is a ministerial act, and must be performed according to law; if it is issued against law it is void. Such is the character of the defendant's title. His location was made upon land which had been reserved from location, and which was not liable to be thus appropriated; and this was the case when the patent issued. It was, therefore, issued contrary to law, and is consequently void. It is an elementary principle not to be touched, that an act, in order to be valid, must be legal. An act which is done contrary to law must be held void.[45]

---

[43]*State v. Bradford*, 121 Tex. 515, 50 S.W.2d 1065, 1080 (1932).
[44]*Void*, Black's Law Dictionary 1798 (9th ed. 2009).
[45]*Sherwood v. Fleming*, 25 Tex. 408, 427 (1860) (internal citations omitted).

Allen's title to the 134-acre tract is tied to the deeds he obtained in March 2016 following a tax foreclosure sale. To be sure, Allen has deeds to the 134-acre tract that he obtained in a tax sale, but the only interest a purchaser in a tax sale obtains in property acquired in a tax sale is the interest that is owned by the defendant or defendants on whom the taxing entities foreclosed.[46] Tax Code section 34.01(n) provides that a tax deed "vests good and perfect title in the purchaser or the purchaser's assigns to the interest owned by the defendant in the property subject to the foreclosure."[47] Thus, the tax deeds gave Allen no better title than his predecessors in the 134-acre tract. And as we have explained, the land patent the governor signed in 1907 conveying the 134-acre tract to George R.L. Bristley is void because when the state issued the 1907 patent it did not own the 134-acre tract.

In his remaining arguments, Allen claims that Crown cannot challenge the validity of his title to the 134-acre tract because the Tax Code has a one and two-year statute-of-limitation defense that applies to Crown and that Crown failed to deposit the tax debt and other amounts

---

[46]Tex. Tax Code Ann. § 34.01(n).
[47]*Id.*

51

required by the Tax Code to be deposited in the registry of the court as a prerequisite to challenging his deeds.[48] These claims lack merit because Allen acquired the same interest his predecessors in title had to the 134-acre tract. As against Crown's claim, a claim traced to the Delgado Patent, Allen's claim is unenforceable.[49]

In *Johnson v. Liberty County*, No. 09-15-00410-CV, 2016 WL 4040143, at *10 (Tex. App.—Beaumont July 28, 2016, no pet.) (mem. op.), we held that the prescriptive periods of limitations and restrictions in the Tax Code do not apply when the tax deed at issue is void. Several of our sister courts of appeal that have considered the issue have reached the same conclusion, holding that tax deeds that are void are subject to

---

[48]*See id*. § 34.08, 33.54(a).

[49]*See Bradford*, 50 S.W.2d at 1080 ("It is not the public policy of this State to place public lands upon the market for sale where they have already been sold and are held by patents and awards or other conveyances regularly issued by the officers of this State, and claimed and occupied by those who hold 'under color of title from the sovereignty of the State.'"); *Guenther v. Robison*, 118 Tex. 485, 17 S.W.2d 765, 766 (1929) (orig. proceeding) (Comm. Section A) ("No law can be found which undertakes to authorize the Land Commissioner, except at the instance of patent holders in cases specified in the statutes, to annul any patent which has been fully executed by the proper officials. This requires the exercise of judicial authority. No such authority appertains to his office, and no duty in this respect rests upon him. The patent in question stands as a barrier to the issuance of the permit sought by the relator.").

collateral attack.[50] Additionally, a plaintiff may challenge a tax deed that is void and the challenge is not subject to the affirmative defenses that are in the Tax Code.[51] Accordingly, we overrule Allen's first and second issues.

## IV. Conclusion

Having overruled Allen's issues, we hold that Crown's summary-judgment evidence establishes that it has superior title to the property at issue in the suit to that of Allen—property that Allen's tax deeds describe as 134 acres, more or less, tract 1, G.R.L. Bristley Survey, Abstract 907, more fully described in volume 1180, page 216 of the deed records of Liberty County, Texas.[52] We also hold the trial court correctly granted Crown's motion for summary judgment and denied Allen's.

---

[50] *Cuanto Antex Mejor, L.L.C. v. EOG Resources, Inc.*, No. 04-17-00504-CV, 2018 WL 1733174, at *5 (Tex. App.—San Antonio Apr. 11, 2018, no pet.) (mem. op.); *Sec. State Bank & Trust v. Bexar Cnty.*, 397 S.W.3d 715, 723-24 (Tex. App.–San Antonio 2012, pet. denied); *Hays v. Butler*, 295 S.W.3d 53, 57-58 (Tex. App.–Houston [1st Dist.] 2009, no pet.); *Mem'l Park Med. Ctr., Inc. v. River Bend Dev. Grp., L.P.*, 264 S.W.3d 810, 813-17 (Tex. App.–Eastland 2008, no pet.).

[51] *Id.*

[52] The deed that purports to convey Allen a 75% interest in the 134-acre tract misspells "Bristley," spelling it "Bristly."

The trial court's judgment is affirmed.

AFFIRMED.

HOLLIS HORTON
Justice

Submitted on August 31, 2023
Opinion Delivered June 20, 2024

Before Golemon, C.J., Horton and Wright, JJ.